Matthew M. Lett, J.
Three stockholders ’ derivative actions were consolidated and tried before me.[1] ..The subject corporation, a Delaware company, is Shahmoon Industries, Inc. It was formerly known as Warren Foundry & Pipe Corporation. The principal defendant is Solomon E. Shahmoon, the corporation’s president, chairman of the board, director and major stockholder, and it was he (after becoming interested in the Warren company) who gave the impetus to the change of its corporate name.
The charges against the defendants were many, substantial and minor, and the ramifications were considerable. The issues were bitterly contested. The presentation of proof, pro and con, occupied many court days. The exhibits were numerous. Voluminous briefs on the law and the facts were submitted. I have studied the entire record, and it is plain that, in the main, the issues requiring resolution are not matters of law, but rather questions of fact. Findings of fact and conclusions of law were *410 duly waived by the parties. This opinion will therefore constitute the formal decision of the court, in accordance with the statute (Civ. Prac. Act, § 440).
I shall first consider the attack made by the plaintiffs upon the stock purchase agreement, dated March 6,1953, entered into between the defendant corporation as seller and the defendant Shahmoon as buyer. By this contract, the company agreed to sell, and Shahmoon agreed to buy, at $28 per share 30,000 shares of the company’s capital stock, then held in its treasury, $100,000 of the purchase price to be payable on April 1, 1953, and the balance in five equal annual installments on or before April 1 of each year, with interest on the unpaid balance at 4% per annum, with the right on the part of Shahmoon to prepay any balance due with interest to the date of such prepayment. The agreement further provided that, if Shahmoon should default in any installment payment, the company may declare the contract cancelled and any amounts theretofore paid shall be forfeited to the company as liquidated damages. It was also provided that, to secure the payment of the amounts due under the contract, Shahmoon would assign to the company all dividends due or to become due on the treasury stock until the purchase price thereof had been fully paid. When Shahmoon paid for the 30,000 shares in full, the company would transfer the stock to him. In the ‘ ‘ whereas ’ ’ clauses in this agreement, it was recited that because of the company’s program of expansion, the company was in need of moneys and that it was not feasible to offer the stock for sale to the public, and that the executive committee of the board of directors of the company had, by resolution dated March 5, 1953, approved the transaction set forth in the agreement. Some background setting may be helpful at this point.
Paragraph 9 (d) of the certificate of incorporation provides, among other things, that, if authorized by the by-laws, a committee may be designated by resolution passed by a majority of the whole board, which “ shall have and may exercise the power of the Board of Directors in the management of the business and affairs of the corporation ”. Article V of the by-laws of the company provides, in part, that the board of directors may designate two or more of their number to constitute an executive committee which ‘1 shall between sessions of the Board have all the powers of the Board in the management of the business and affairs of the Company, * * *. The taking of action by the Executive Committee shall be conclusive that the Board was not in session at the time of such action. ’ ’ Shahmoon *411 had become a member of the board of directors of the company in 1951. At Shahmoon’s invitation the defendant Salomon, an attorney and counsel to the company, also became a board member.[2] Salomon suggested that an executive committee be organized to run the day-to-day affairs of the company. At a meeting of the board on October 23, 1952, Shahmoon, Salomon and Jack E. Hay[3] were designated as members of the executive committee, ‘ ‘ having the powers of the Board of Directors when the Board was not in session ”.
There was sharp conflict at the trial as to the motivation for, the mechanics involved in and the respective advantages resulting from, the stock purchase agreement. The evidence discloses, and I find, the following facts:
The idea of arranging for the stock purchase originated with Salomon, and it was he, as counsel for the company, who drafted the agreement therefor. The matter was discussed a number of times, the first occasion being some two months before it was submitted to the executive committee for their formal consideration. The reason for the transaction was the company’s need for money and its inability to borrow. Cash was required to pay the debt installment due in June, 1953 to Metropolitan Life Insurance Company, the mortgagee of the company’s properties, and to have funds available for the modernization, improvement and expansion of the corporation’s installations — such as the Mount Hope Mine and the Phillipsburg and Everett plants — for, in their then rather obsolete condition, the cost of production was high and rendered the company unable to compete with other manufacturers.
The company’s need for cash was critical. It had sold all but some $45,000 of its securities and still its cash position was down to practically nothing. In connection with the cash condition in which the company found itself in early 1953, the plaintiffs’ accountant testified, from his examination of the books and records of the company, that the average monthly expenses and overhead costs in 1953 were between $500,000 and $600,000, that the cash balances at the end of March and April, 1953 were, *412 respectively, $88,000 and $41,000 (exclusive of the $100,000 and $200,000 received from Shahmoon on account of the purchase of treasury stock) and that such balances were not sufficient to operate the company.
In the discussions Hay had with Salomon as to the best method of raising the needed and desired cash, the possibility was considered of placing the treasury stock on the public market as well as of selling it to other officers or directors or other persons. Efforts were made to sell some treasury stock to another director of the company — one Lederer, also a defendant here — but he refused even to consider buying stock at any price, and it was felt, after exploring the situation, that it would not be feasible or desirable to sell the stock in the open market. Such a public proposal would undoubtedly have an adverse effect on the stock, and depress its price; and even if such a block of stock could be sold on the market, underwriters would not be interested in handling the transaction except at a fee of $3 or $4 per share and thus the company would not benefit as fully as it would by way of private sale.
As treasurer of the company, Salomon was thoroughly aware of the company’s financial condition. There were several unsuccessful attempts to obtain bank loans for the company. In each instance, a loan was turned down, even though applied for on a secured basis. The Guaranty Trust Company refused the company a loan. The Metropolitan Life Insurance Company refused, in the years 1952 and 1953, to increase the amount of its mortgage loans to the company.
The cash resources of the company were drying up; the competitive position of the company was weakening. Salomon was of the opinion that it was necessary to get cash quickly. Accordingly, he devised the idea of tying up and disposing of the entire block of 30,000 shares of treasury stock so as to raise as much money as possible for the company. During February, 1953 — several weeks before the March 6 agreement was entered into — Salomon discussed with Shahmoon and with Hay (the three of them constituting the executive committee) the entire situation in which the company then was. When Shahmoon was approached to purchase the 30,000 shares of treasury stock, he first expressed his unwillingness to enter into the transaction. Out of 170,000 shares of stock of the company outstanding, Shahmoon and his wife owned approximately 66,600, which made the Shahmoons the principal stockholders by far. Shahmoon did not want to commit himself for the payment of some $850,000 for the additional investment. The stock was selling on the New *413 York Stock Exchange at $26 per share; the price he was to pay was $28. He objected to the proposed forfeiture clause in the agreement.
Salomon testified that he was not certain whether or not the agreement would be approved at the executive committee meeting and whether or not Shahmoon would vote for it, but he believed that this was the only way for the company to get out of its then difficulties. At any rate, Shahmoon did agree. What prompted Shahmoon to enter into this transaction was, first, the urgent need of the company (in which he had invested so much) for the cash which he could supply, and, secondly, his desire, by making this additional investment, to convince the Guaranty Trust Company and other banks that he had confidence in the future of the company, which would help later on in its efforts to obtain loans when needed.
After the meeting of the executive committee in which this March 6 agreement was discussed and approved, it was submitted to and approved at a meeting of the board of directors on March 13,1953. Notice of this agreement was given to stockholders in the financial statement sent to them for the six-month period ended June 30, 1953. At the annual meeting of the stockholders, held on June 9,1954, discussion was had as to this agreement, and thereupon a motion for a vote of confidence in Shahmoon was passed unanimously and he was re-elected a director and chairman of the board of directors. Pursuant to the rules of the Securities and Exchange Commission (S. E. C.), the company filed with it on September 1, 1954, a report of the purchase by Shahmoon of the 30,000 shares, and, after the stock was delivered to Shahmoon in February, 1955, the company on March 1,1955, filed another report with the S. E. C. indicating this transfer. During this two-year period the stock sold in the open market for under $28 per share.
In my view of the evidence, I do not find that there was any fraud involved in connection with the making of this agreement or that the price was inadequate or that more money could have been obtained for the stock through sales by other means. It is true that, in February, 1955, when the final payment was made under the purchase agreement, and the stock delivered to Shahmoon, it had risen in value to approximately $40 a share, but what the plaintiffs ignore is that, when the agreement was made in March, 1953, the price that Shahmoon contracted to pay was $2 more than the market price. Other events subsequent to the making of the contract support the defendants’ assertion of its propriety.
*414 I have heretofore made mention of the quite probable likelihood that to place the 30,000 shares on the market for public sale would result in the price being depressed. That view is buttressed by the fact that, several years later — in 1956 or 1957 — Shahmoon sought to sell approximately 12,000 shares of the stock of the company to a specialist. Before obtaining the New York Stock Exchange permission to do this, he explained the urgent need for these shares to be sold. The exchange then fixed the price at $2 below the then market price. When Shahmoon attempted to increase the offering by an additional 4,000 shares, the specialist told him that he would have to fix a price at $4 below the market price.
In further substantiation of the fact that the company was desperately in need of cash funds, there was undisputed testimony to the effect that, in 1954, Shahmoon sold a substantial amount of his personal securities (most of which were dividend-paying) in order to obtain moneys which he could and did lend to the company. After receiving about $1,500,000 on such sales, Shahmoon loaned the company approximately $1,000,000 in 1954, and again, in 1956, he sold other personal assets and loaned the company approximately an additional $1,000,000. Parenthetically it may be added that Shahmoon never asked for or received any security on any of the loans he made to the company. On the contrary, Shahmoon’s efforts in personally aiding the company in its financial crises are emphasized when I note that, in April, 1954 he subordinated the very substantial obligations of the company to him, so that it would then be able to obtain an additional loan from the bank to the extent of some $430,000.
Returning for a moment to the unsafe financial condition of the company when the stock purchase agreement was entered into, the evidence was uncontradicted that, on March 31,1953 the cash balance of the company was approximately $188,000 and this included the $100,000 which the company had received from Shahmoon on account of the initial payment pursuant to the contract. The cash position of the company was so precarious that, although another payment under the contract was not due until the Spring of 1954, Shahmoon voluntarily paid an additional $100,000 on account in April, 1953 and, although the payments under the contract were not to be completed until 1958, Shahmoon made the final payment on February 4, 1955. True, this payment was effectuated by reducing the company’s indebtedness to Shahmoon by the amount Shahmoon then owed pursuant to the March, 1953 agreement. The reason for applying *415 his own loan to the company as against moneys he owed under the agreement was that the Guaranty Trust Company insisted that before it would lend any money to the company it wanted the stock purchase agreement liquidated. It is worth recording at this point that, when Shahmoon received the stock on February 4, 1955, he paid interest of some $26,000 on the unpaid balance of the purchase price even though at that time the company owed him about $1,000,000 on some loans he had made to it and on which loans there was no security given to him and no interest paid to him.
I hold that this transaction was not void or voidable, and the attack on it must fail. Accordingly, it is unnecessary to determine whether or not this phase of the lawsuits is barred by the Statute of Limitations or whether certain of the plaintiffs are barred from suing because they were not stockholders at a specified time, as contended by the defendants, and it is equally unnecessary to consider whether the plaintiffs are barred from equitable relief as to this issue by reason of acquiescence or ratification or delay in asserting their claim in regard to it.
The next issue to be considered is the propriety of a stock purchase option granted to Shahmoon and other officers of the company. A motion before trial in the Sorin action — grounded at the time on this issue — to dismiss the complaint for insufficiency as a matter of law was denied (3 Misc 2d 953, affd. 2 A D 2d 678). Briefly, the facts on that phase of the case are as follows:
On June 9, 1955 the stock was selling at $46 per share. On that date, at a meeting of the board of directors, a stock-purchase option plan fixing the price at $54 was — after some preliminary informal discussions among the directors — presented to the board. Shahmoon was present when the meeting was convened; he left the meeting-room during the period when the stock option plan was being discussed, as Salomon had advised him to do and as Salomon had stated that he, Shahmoon, could not express an opinion with respect to it or vote on it. Lederer, one of the members of the board, suggested that Shahmoon receive 25,000 shares out of the 28,000 shares to be optioned.[4] Shahmoon was to lend the company up to a half million dollars during the life of the option, and this obligation was incorpo *416 rated in the agreement. The option was to expire December 31, 1957.[5]
The agreement was approved at a meeting of the board of directors on June 9, 1955 by a unanimous vote. Notice of the granting of this option was set forth in the semi-annual report to stockholders of June 30, 1955, which report was sent to stockholders on August 26,1955. It was therein stated that the option was granted to the principal stockholder of the company for 25,000 shares at $54 a share, and that “ it is subject to ratification at the next annual meeting of stockholders ’ ’. In the notice of annual meeting of stockholders for May 10,1956 — which was the next annual meeting of stockholders — it was stated that one of the purposes of the meeting was to approve a proposed stock option plan for key employees of the company. This notice stated that “ on June 9, 1955, the Board of Directors entered into an agreement with the principal stockholder of the corporation, Mr. S. E. Shahmoon, granting him an option to purchase all or any part of 25,000 shares[6] of the Corporation’s Common Stock pursuant to the terms of the Stock Option Plan at the price of $54.00 per share.” The stockholders were fully and accurately informed with respect to the stock option plan, which was recommended to them by the board of directors, and, at their meeting, the stockholders approved it by an overwhelming vote.
The plaintiffs contend that this stock was subject to preemptive rights and that they were deprived of the right to purchase these shares in proportion to their own stock holdings. *417 However, the plaintiffs admit that, ordinarily, pre-emptive rights do not attach to treasury stock, which this was (Borg v. International Silver Co., 11 F. 2d 147, 151). But, they say, this principle of law is not here applicable because Shahmoon, as the dominant personality in the affairs of the company, was guilty of inequitable conduct and of the perpetration of a fraud upon the corporation (cf. Hammer v. Werner, 239 App. Div. 38).
Section 157 of the Delaware General Corporation Law provides, among other things, that the “ terms upon which, the time or times, which may be limited or unlimited in duration, at or within which, and the price or prices at which any such rights or options may be issued and any such shares may be purchased from the corporation upon the exercise of any such right or option shall be such as shall be fixed and stated * # * in a resolution or resolutions adopted by the board of directors providing for the creation and issue of such rights or options * * *. In the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be conclusive.” (See New York Stock Corporation Law, § 69.)
No inequitable conduct and no fraud of any kind has been shown in respect of this transaction. In my view, too, the plaintiffs have failed in their attempt to prove that, when granting this option, the board of directors of the company was dominated and controlled by Shahmoon to such an extent that the other members of the board were mere dummies and tools in his hands. I hold that the stock option plan was neither void nor voidable and that the option granted to Shahmoon is valid. (Cf. Beard v. Elster, 160 A. 2d 731 [Sup. Ct., Del.].) It is therefore not necessary for me to consider whether, as claimed by the defendants, the abolition of pre-emptive rights at the stockholders ’ meeting on February 23, 1956 — prior to the final approval of the stock option proposal by them on May 10, 1956 — was valid.
There are several charges of waste and mismanagement. It is asserted by the plaintiffs that such delicts were shown in that, with the company short of funds, there should have been no program undertaken of modernization, development and expansion. It is true that in the early part of 1953 and for some time thereafter the company was short of cash. And it is true also that substantial expenditures were made in revitalizing obsolete plants and in opening new mines. Yet, I do not go along with the plaintiffs in their criticism — at least, to the extent of holding the defendants personally liable for the expenditures thus made. In connection with charges of waste and mismanagement, it must be borne in mind that officers and directors are *418 permitted to exercise their best business judgment in the running of the company, provided that what they do appears to be reasonable under the circumstances and in the corporate interest. And, ‘ ‘ however high may be the standard of fidelity to duty which the court may exact, errors of judgment by directors do not alone suffice to demonstrate lack of fidelity ” (Everett v. Phillips, 288 N. Y. 227, 232). On all of the evidence, I am convinced that what the officers and directors did in respect of this program was appropriate and perhaps necessary. Indeed, in some aspects, the plan turned out to be quite profitable.
For example, in 1953, the sum of $148,000 was spent at Beach Glen, and $381,000 was spent at Anomoly. These funds were expended in order to improve the efficiency of the operations and to reduce the cost of production. And, similarly, $691,000 was spent at the Mount Hope mine for the same purpose. During 1953 the Mount Hope, Beach Glen and Hibernia Pond Anomoly mines did not operate at full capacity. The plain reason therefor was that the company did not expend sufficient moneys to better the situation. And the reason for non-expenditure was that the company was weak in cash availability. But, in view of the improvements in the properties undertaken by Shahmoon and his colleagues, there was more production and at lower cost. The savings approximated $3 per ton, a valuable differential in a competitive market.
The Phillipsburg plant was in no condition to operate effectively in 1956. In fact, there was progressive deterioration at that plant from before 1953, and there was no production whatsoever in 1957 and until early 1958. The company spent about $2,500,000 in correcting and improving this plant. In the light of the probable staggering loss to the company, both income-wise and capital-wise, were the plant to remain permanently closed, I cannot hold on the proof presented that the judgment of the management in undertaking this expenditure was factually faulty or legally actionable. Actually, there is no dispute that the plant has since then been operating at a considerable profit.
Shahmoon testified that in his judgment much more could have been done to make for more efficient and more economical production, but the company simply did not have the needed funds completely to effectuate that aim. I accept that testimony as the accurate expression of proven fact and of honest opinion. True, the demand for ore was not constant — at times it would diminish, at other times it would increase. And the result was that the company could not always currently sell all of the ore which it produced. But, this type of product is not perishable, maintenance of inventory involves little overhead, and there is *419 an advantage from the point of view of fluctuating market demands in stockpiling as much ore as possible. At least, the management could reasonably so determine, and, if it acted in accordance with its honest business judgment in continuing to mine ore at full capacity, there is no justifiable basis for a charge of waste.
Another benefit realized by the company as the result of these expenditures was in tax savings. It was able to secure certificates of necessity running over $25,000,000, under a special mining law of 1951 which enabled the company to write off as current operating costs all the expenses that were incurred in this program of modernization, development and expansion.
Taken as a whole, the financial returns and status of the company have definitely improved since 1953. That there were no formal meetings of the board of directors at which authorization of the expenditures for the program in 1953 and 1954 was given does not necessarily impose liability for reimbursement therefor upon Shahmoon. Shahmoon spoke with members of the board informally about these matters. And during this period, the affairs of the company were being run by the executive committee in accordance with the by-law provisions and the resolutions of the board of directors (see Del. Corp. Law, § 141 [G]). Moreover, the board was notified about the expenditures, in general they were approved by the board, and reports thereof were given to stockholders each year, at whose meetings there were votes of confidence in, and re-election of, Shahmoon and other defendants.
One criticism levelled at the defendants was the purchase by the company of some of its capital stock. I do not find these transactions vulnerable. At a meeting of the executive committee on September 16,1953 Shahmoon was authorized to purchase for the company on the Exchange up to 3,000 shares of the company’s stock at not more than $28 a share. Pursuant to this authority, the company bought 2,000 shares of its own stock in September and October, 1953 at prices ranging from $23.75 to $25.50. This was, of course, just several months after the March, 1953 purchase agreement pursuant to which Shahmoon agreed to pay the company $28 per share.
Another claim made in support of the plaintiffs’ allegation that there was mismanagement is that there was no disclosure to stockholders of the quantity of the company’s iron ore reserves. It might well be good business policy not to make public revelation of this information in a highly sensitive and competitive market. And it appears that such was the policy of. the company even prior to the time when Shahmoon became its principal officer. In fact, in the annual report to stockholders *420 of December 31, 1950 there was a statement that the company-does not publish its estimates of iron ore reserves since such estimates would at best be speculative.
Objection has been made that the head office of the company was moved from Phillipsburg, New Jersey, to New York City. I find no sound basis for complaint here. Residence of the principal executives, location of other properties, facilities for those in the market, administrative efficiency, other business advantages — all dictated the geographic change. In fact, the result has been that, over the years, moneys were saved the company by this move. .
In a supplemental complaint filed in the Sorin action, it is alleged that the change of name of the subject corporation from “ Warren Foundry & Pipe Corporation ” to “ Shahmoon Industries, Inc.” was improper. The plaintiffs urge that “ Warren ” was a name of long standing and value in the industry, and that its abandonment by the directors for the corporate name of “ Shahmoon ” was a result of the board’s docility as compared to the new executive’s self-esteem and personal drive. Egoism and energy there certainly were in respect of Shahmoon’s relation to the subject corporation. But there has been no proof of improper control over fellow officers and directors to the detriment of the company as to this matter.
A stockholder does not, as such, have a vested right in the corporate name. In my view, the tradition contended for by the plaintiffs must be supported by proof that the change was unlawful or harmful. There is no proof that any damage resulted to the corporation from the change complained of. And it was duly made in full compliance with the statutes of Delaware, the certificate of incorporation, and the by-laws of the company. Indeed, on the trial, the plaintiffs did not assert the contrary. It may be that, in good faith and perhaps with good business judgment, the defendants were of the view that Shah-moon’s value to the company would be augmented by incorporating his name in the company designation. That may have been a species of psychologic pandering to the vanity of Shah-moon, but it is not — on the proof in this case — subject to attack as corporate mismanagement on the part of the defendants.
The directors are charged with paying Shahmoon compensation in excess of his worth. Beginning as of 1953 his base salary was $30,000. In that year he was awarded $30,000 additional. In 1954 he was paid his base salary, $30,000, and no more.. In 1955 the sum of $30,000 additional was paid to him; in 1956 the added amount was $45,000. In 1957 Shahmoon’s salary was fixed at $75,000 per year, and that has since been his *421 compensation. There is no doubt that the burden is upon the defendants to justify such payments (Godley v. Crandall & Godley Co., 153 App. Div. 697, 711, mod. on another ground and affd. 212 N. Y. 121). On all of the evidence, I am of the opinion that that burden has been met.
When Shahmoon was first engaged as the corporation’s executive manager, it was arranged that his base salary of $30,000 per annum was to be augmented at the end of the year — depending upon his work for, and the success of his efforts on behalf of, the company. According to the plaintiffs, in determining the character of Shahmoon’s operations, the expenditures at the various properties and the results therefrom are relevant. I agree.
The plaintiffs point to the facts that — whereas in previous years the company did not spend any money on the Beach Glen and Anomaly mines and in 1952 only $147,000 at the Mount Hope mine — during 1953, at the time of the Shahmoon administration, the expenditures at Anomaly were $381,000, at Beach Glen $148,000, and at Mount Hope $691,000; and that notwithstanding these expenditures, say the plaintiffs, production from the Beach Glen mine was very small in 1956 and there was no production before or since, and manufacture did not begin at Anomaly until sometime late in 1957. Thus, assert the plaintiffs, Shahmoon ran the company poorly and was not entitled to any increased compensation at any time.
The picture painted by the plaintiffs is indeed a black one, and, if that were all, the board’s grant of additional pay to Shahmoon might be adjudged wastefully improvident. But there are other factors that are equally relevant, and the dark portrait is entitled to be touched up, at least, by the defendants, who use paints of brighter hue. Some of the modifying colors will be mentioned here, in addition to those adverted to earlier in this opinion. Before Shahmoon became chairman of the board and president of the company, these offices were held by two persons — Whelpley as chairman, who received $30,000 annual salary, and Dohm as president, who received $25,000. It does not appear whether Dohm was or was not a full-time executive, but the evidence discloses that Whelpley did not devote his entire time to the company. When Shahmoon became the chief executive officer of the company, he devoted full time to his duties. Whereas Whelpley and Dohm rarely travelled for the company, Shahmoon was constantly on the go. On the one hand, while neither Whelpley nor Dohm was occupied with the problems of financing of the company, Shahmoon was continually engaged in endeavoring to solve this urgent matter. Shahmoon was the *422 company’s principal buyer and salesman. He purchased all of the scrap iron for the company. He sold all of the company’s iron ore, and for this he did not receive any brokerage commission, which, at regular rates, would have aggregated over $200,000.[7]
In 1953 iron ore production of the company was sold for $3,300,000 and the board of directors granted Shahmoon an additional $30,000 for that year. In the following year, business was not good; iron ore sales dropped to $307,000; Shahmoon did not receive any compensation other than his base salary of $30,000. In 1955 sales soared to $13,800,000 and profits rose to $759,000, and Shahmoon was again awarded an additional $30,000. In 1956 sales were $16,500,000, profits were $1,490,000, and the company sold almost $6,500,000 of iron ore; in that year Shah-moon received additional compensation of $45,000, making a total of $75,000, which, it will be recalled, was in 1957 fixed as his full annual compensation.
These increments were entirely overt. Notice of Shahmoon’s compensation from year to year was regularly given to stockholders in the annual reports. With full knowledge of the facts, the stockholders, time and again, at their annual meetings, expressed confidence in Shahmoon and re-elected him. In the light of the magnitude of the operations, the difficulties of management, the crisis in finances, the services rendered, the time spent — and in the light, too, of the compensation generally paid to the chief executive of large active business corporations, it seems to me that there can be no valid legal objection to what Shahmoon received from the subject company during the years in question.
I must next concern myself with Shahmoon’s expense accounts and his sundry charges to, and reimbursements from, the subject corporation. On the evidence presented to me the situation in respect of these matters is on an entirely different footing *423 from that of the compensation he openly received as determined by resolutions of the board of directors, duly reported from time to time to the stockholders of the company.
Shahmoon is charged with the misuse of corporate funds in connection with his expenses, and which, it is alleged by the plaintiffs, were not adequately accounted for in the company’s books and records. These ran from a low of $5,109.44 in 1955 to a high of $14,952.70 in 1957. For the five-year period 1954-58, an average of about $10,700 per annum was said to have been spent by Shahmoon for travel, entertainment and gifts. These expenditures were, from time to time, reported orally by Shahmoon to the corporation’s office manager, whose procedure (in pursuance of Shahmoon’s direction) was to reimburse Shah-moon out of the company’s petty cash for the sums alleged to have been expended, and — although not usually supported by bills, vouchers, checks or receipts — the office manager allocated the expenses on the basis of what Shahmoon told him or on his own evaluation of the situation.
Quoting from Jersawit v. Kaltenbach (256 App. Div. 580, 581, affd. 281 N. Y. 773), the plaintiffs submit that a “ cestui que trust or principal is entitled to an accounting by a trustee or agent who has been intrusted, with property without the necessity of establishing any misappropriation,” (emphasis in opinion) and that the plaintiffs are entitled to a detailed accounting of the sums spent. The defendants argue that the Jersawit case is inapplicable here because Shahmoon was not “ entrusted with property ’ ’ but merely repaid for expenses incurred. In my view, the plaintiffs have the better of this dispute. All of the company funds were in effect entrusted to Shahmoon and the directors, and they were fiduciaries of the company with regard to their disbursement. It is of no consequence whether Shahmoon received the cash before he spent it or advanced it subject to repayment. He was spending corporate funds and is accountable for them, as are those directors who acquiesced in the outgo.
Shahmoon testified that moneys which he was refunded by the company represented expenses for corporate purposes only, and that no portion thereof was used for his personal benefit. But his ipse dixit in that regard does not suffice. Expenditures not fully disclosed to directors and stockholders are not ipso facto allowable. Loose bookkeeping methods as to an executive officer’s charges to his company are objectionable.
In Kreitner v. Burgweger (174 App. Div. 48, 53), a shareholder’s action, the court said: “ This action is for accounting by persons in a trust capacity and the plaintiff has fully met *424 Ms burden of proof when he traces the assets of the concern into their hands. The clear duty is then imposed upon them of fully accounting for all such trust moneys and they can receive credit upon such accounting only for such sums as they definitely show they have expended for a lawful purpose. Upon no theory of law or equity can they be credited with any moneys for which they cannot account.”
I cannot pass on whether the expenses were justified unless I know what they were. The defense talks of the burden of “ vouchering ”. Although Shahmoon is not required, by virtue of being a company official, to voucher his personal outlays, it is not unreasonable to require that, if he seeks corporate reimbursement therefor, he state just what he has spent, to whom, and where, and for what purpose. It may be a burden to account, but it is an obligation which the high standard of fiduciary loyalty requires the defendants to satisfy. That obligation has been stated by Chief Judge Cardozo in language plain and eloquent: 11 Many forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ‘ disintegrating erosion ’ of particular exceptions”. (Meinhard v. Salmon, 249 N. Y. 458, 464.)
That, as is claimed by the defendants, the Internal Revenue Service did not charge Shahmoon with personal tax liability on these repayments is not binding on the court in an action such as this. The standards of fiduciary responsibility are not to be measured by those of tax accounting. The tax collector may have felt that he had inadequate evidence or manpower, or perhaps for other reasons he did not have the inclination to proceed against the taxpayer. That determination is not equivalent to exoneration of the fiduciary or to satisfaction of his obligations to those, including minority stockholders, for whom he is a trustee.
The defense urges that the expense account in issue, of $10,700 per annum, is petty, indeed miniscule, compared with the $13,000,000 average annual sales of the corporation over the five-year period. The defendants urge that the plaintiffs’ charges of wasted millions have degenerated to quibbles over paltry sums. While the amount in question here is certainly not *425 large in comparison to the company’s volume of business, the duty of a fiduciary does not extend only to major matters or substantial amounts over which he has control. It extends to the last penny with which he is entrusted. Even though any recovery warranted will be relatively minimal, the maxim of de minimis non curat lex is inapplicable. This is not a matter of principal, but of principle. The principle at stake here is simple and ancient: A fiduciary must account for the funds entrusted to his care — and that means “ all of such funds ”, not “ some ” or even “ most ” of them (cf. Matter of Hamilton, 24 Misc 2d 899). A reference will be ordered at which Shahmoon will be held to account for these sums (see Kreitner v. Burgweger, 174 App. Div. 48, 54-55, supra). By that time, any records which Shahmoon may need for that purpose may be gathered together if not already obtained from his former counsel (see Matter of Sorin v. Shahmoon Industries, 20 Misc 2d 149). The Referee will report with his recommendations.
The plaintiffs cite further instances of waste of corporate funds and assets and assert that these inured to Shahmoon’s personal benefit: Flowers grown in Shahmoon’s private garden were sold by him to the company; Dow-Jones news and stock tickers were installed in his office, at company expense, for Shahmoon’s personal use; Shahmoon and his wife were supplied with and used a company automobile for personal purposes and operated it at company expense; when Shahmoon travelled on company business or attended industry conventions, his wife frequently went with him, and her expenses were charged by Shahmoon to the company.
I cannot say, as of now, as the plaintiffs charge, that these are “dramatic” examples of waste. That depends, respectively, on the price and use of the flowers, the use of and necessity for the tickers, whether the vehicle involved was used for personal as distinguished from company purposes, and, as to Shahmoon charging the company for the expense of his wife’s companionship on his business and convention trips, the amount thereof needs ascertainment. This much is clear: Undisclosed fringe benefits are forbidden to a fiduciary; self-dealing by a trustee is looked upon askance by the courts; a publicly-held stock corporation is not the private preserve of its principal stockholder; the purchase of facilities or services, at company expense, but put to personal use, is improper. With these precepts in mind, the reference hereinbefore directed will also include these issues, as to which, after accounting and testimony, the Referee will similarly report thereon with his recommendations.
*426 Throughout the trial and in their post-trial briefs, the defendants have pressed the point that one plaintiff or another did not have capacity to sue because he was not a stockholder at the time of the transaction complained of by him or at the time of the commencement of the action or at the time of the trial. I have heretofore had occasion to point out that, under the established law on the subject — whether the matter be examined from the standpoint of the plaintiff’s “ incapacity to sue ” or of his “having a cause of action” — “it is necessary [in an action such as this] for the plaintiff to show, in order that she may recover, that she was a ‘ stockholder at the time of the transaction of which [s]he complains ’ * * * and that she was a stockholder as well at the time of the commencement of the action ” (Harris v. Averick, 24 Misc 2d 1039, 1040). I add here that it is equally well established that the plaintiff must also be a stockholder at the time of the trial (Pikor v. Cinerama Prods. Corp., 25 F. R. D. 92, 94; Hoover v. Allen, 180 F. Supp. 263, 266; see Tenney v. Rosenthal, 6 N Y 2d 204, 210-212; cf. Hayman v. Morris, 46 N. Y. S. 2d 482, 494).
Since I have determined that the defendants are entitled to judgment on the merits on all issues in the case except those in respect of which an accounting has been ordered, the only matters remaining which require that the respective plaintiffs have appropriate status relate to the causes of action giving-rise to such accounting. And, as to this, I hold that — since this is a stockholder’s derivative action — if there be a single proper plaintiff remaining in the case the accounting herein directed is to go on, subject to the limitations now to be considered. These are: first, against whom as defendants should the action proceed? And, second, for what period of time should the accounting be made by those defendants? The rules of law in that regard are quite clear.
First, the appropriate plaintiff must show that the specific defendant sought to be charged was a director or participating officer at the time of the transaction complained of (Lifshutz v. Adams, 285 N. Y. 180).
On the second restriction just mentioned, it is relevant to note here that, during the course of the trial, I granted the plaintiffs in the Perry action (which was instituted in Oct., 1957) leave to amend their complaint so as to extend the period of attack to cover transactions to and including the year 1958. Insofar as the Statute of Limitations was asserted as a defense to the matters alleged in the several complaints, initially or by way of amendment, and remaining for disposition on the accounting, I hold that the three-year provision (Civ. *427 Prac. Act, § 49, subd. 7) does not apply. This phase of the suits is not for “ waste ” alone, but for money had and received stemming from the misconduct and misfeasance of the defendants (Augstein v. Levey, 3 A D 2d 595; Croen v. Gottlieb, 8 Misc 2d 628 and cases cited therein) — as to which the governing statutory bar is six years (Civ. Prac. Act, § 48, subd. 8).
Accordingly, since the plaintiff Hennesey became a stockholder on December 20, 1955, the matters to be heard before the Referee in respect of the claim of that plaintiff will embrace the period commencing with that date. These allegations are contained in paragraph 11 (b) of the Hennesey complaint (except “as well as servants”); paragraph 12 (a) (except that it is to be for the period from December 20, 1955, through December 31, 1958); and in paragraph 13 (except the last two sentences thereof).
In respect of the plaintiffs in the Perry suit, let it be noted here that, during or at the close of the trial, the defendants’ motions to dismiss were granted in respect of the causes of action of the following plaintiffs, and that they are no longer in the case: Rose B. Alcott, Bernard H. Lagowitz, Josephine N. Burke, Emanuel Unger, Norman Pell, Alexander Cadoux, Robert J. Berner, William Berner and Doris Kirschbaum. The following plaintiffs in the Perry suit remain in the case for the purposes of the accounting: Perry and Peoples First National Bank & Trust Company, from 1954, the beginning of the matters complained of; Schoenbrod from May 7, 1957; Fielman from January 13, 1956; Pinon from March 20, 1956; De Yore from March 20, 1956; Imhof from December 13, 1955; Justin from November 26, 1956; and Dash from October 31, 1957 — the dates when, respectively, they became stockholders, and all through the year 1958, as pleaded by way of amendment.
As to the defendants, it should be noted that, by stipulation, the defendants Darzi, Lederer and Jack E. Hay have been deemed to have filed the same answer — denials and defenses — to the Hennesey complaint as that interposed by the defendant Shahmoon. The accounting is to proceed as against the defendants Darzi and Jack E. Hay to November 7, 1956, the date of their resignations as directors of the subject company. (The counts as against these defendants, insofar as they concerned charges of waste and misconduct subsequent to that date, were dismissed at the trial.) The accounting by the defendant Lederer is to commence from December 20, 1955, the date that he became a director, and it is to cover the period through the year 1958. The action against the defendant Salomon was (as hereinbefore noted) discontinued with prejudice, and, of *428 course, he is not to be a party on the accounting, although ho may be a witness before the Referee. It appears from the exhibits that the defendant Stires became a director on June 28, 1956, the defendants Cooper and Nissan on November 29, 1956, the defendants McLaughlin and Newton on May 10, 1957, and the defendant Maier was a director from March, 1957 until May 10, 1957. But it does not appear that any of these defendants was served with process or appeared in the action. They have, therefore, not been and are not now before the court. Just as in the Hennesey suit, the responsibility — if any — to be shouldered by the defendants Darzi and Jack E. Hay extends to the period ending November 7, 1956, so, too, in the Perry action is this the outside chronological limit of their responsibility. With respect to the defendant Steve Hay, his accountability commences from June, 1956, the. date when he became a director, and ends on December 31, 1958. And, of course, the defendant Salomon cannot be held responsible in any way since the Perry action against him has also been discontinued.
During the course of the trial, I made disposition of a number of motions by the several defendants in reference to the respective complaints or portions thereof. The following subparagraphs of paragraph 20 of the Perry complaint were dismissed and stricken during the trial in respect of all of the defendants: A, as to the year 1954, E, F, G-, K, L, M, N, P, Q and S; and cause of action No. 7 in its entirety. With respect to the action instituted by the plaintiff Hennesey, the following portions of the complaint were dismissed and stricken upon the trial: In paragraph 11: in subparagraph (b) the words “ as well as servants ” in the fifth line thereof; subparagraphs (c) and (d); in paragraph 12: subparagraph (a) with respect to the period from 1952 to December 20, 1955; subparagraph (b); the last two sentences of paragraph 13; and all of paragraph 14.
It is now in order for me — in the light of my determinations as contained in this opinion — to dispose of the motions on which I reserved decision during the trial: With respect to the Hennesey action, paragraph 15 of the complaint is stricken, except insofar as it concerns the issues embraced in the reference hereinbefore ordered; subparagraphs (g), (h), (i) and (j) of paragraph 11 are now stricken. In respect of the Perry complaint, in paragraph 20, subparagraph A, the balance heretofore not stricken on motion is now stricken; subparagraphs B, O and D are embraced in what will be considered by the Referee; subparagraphs H, I, J, O and R are stricken. The first cause of action is dismissed except with respect to those *429 matters for which, a reference has been ordered. Causes of action Nos. 2, 3, 4, 5 and 6 are dismissed in their entirety. In the Sorin action, the complaint (consisting of two causes of action) and the supplemental complaint (consisting of a third cause of action) are dismissed on the merits in their entirety. It will be recalled that the first two Sorin counts relate to the stock option plan and the stock purchase plan, and that the count added in the supplemental complaint relates to the alleged improper change of name of the corporate defendant.
Eespective exceptions are noted for the appropriate parties in respect of each of my rulings as herein contained. Settle interlocutory judgment providing for a reference.

. In view of the fact that in large measure the three actions involve the same issues, reference will be made to the separate suits only when the distinct matters therein are being considered.

. Salomon resigned as an officer of the company in 1955. He ceased acting as counsel to the company in 1955. He resigned as a director in 1956. He is no longer a stockholder. The stockholders’ derivative actions which initially were brought against him as one of the defendants were discontinued by the plaintiffs, with prejudice, as to the causes alleged against him.

. That Hay is Shahmoon’s brother-in-law does not vitiate the designation. Nor does that fact alone nullify the acts of the committee, albeit it warrants and requires close scrutiny as to whether any specific act of the committee may be justified on the basis of the determination of the committee.

. An option was also granted to another executive of the company at this time — one Lionel Goldberg. When Goldberg left the company’s employ, he insisted on exercising his option to buy 1,000 shares at $54 each. When the company refused to sell the stock to him in accordance with the option agreement of June 9, 1955, Goldberg instituted a lawsuit thereon. Thereafter, the thousand shares were so sold to him pursuant to action of the board of directors. No complaint seems to have been made as to this transaction.

. By agreement dated April 5, 1956, this expiration date was extended to June 9, 1960. The extension was approved by the board of directors on April 5, 1956, and by the stockholders on May 10, 1956. At the trial, I granted a motion by the plaintiffs to amend paragraph 56 of the Perry complaint so as to allege that in April, 1956 Shahmoon caused the company to extend the date for the purpose of influencing the decision of the court on the plaintiffs’ motion for an injunction pendente lite. I find that the plaintiffs have failed to prove facts sufficient to support this added allegation. I suppose that, by way of cynical conjecture, as distinguished from logical inference, I might find the ultimate fact as alleged by the plaintiffs. Having come, however, to the determination (as hereinafter in this opinion expressed) that the option agreement with its initial expiration date was not subject to rescission in this action, I do not, on the evidence, see any justification for a change of decision because of the added factor of the extended expiration date for the exercise of the option.

. It should be noted that, as a result of a subsequent four-for-one split of the company’s stock, the 25,000 shares of stock optioned to Shahmoon now amount to 100,000 shares. The notice of meeting to the stockholders also stated that the references therein to the option are prior to the four-for-one split, so that it was dear that, at the time of the meeting, Shahmoon had an option to purchase 100,000 shares of stock.

. That Shahmoon did not personally close some of the deals or sign the contracts or otherwise formalize the transactions is of no moment. Shahmoon negotiated all contracts with Bethlehem Steel Company and with Alan Wood Steel Company, and sent one Djedda, a company employee, to close them, because he, Shahmoon, was at the time unable to go himself. Djedda, no longer employed by the company, testified for the plaintiffs. He admitted on cross-examination that it was Shahmoon who instructed him to go to Bethlehem Steel to consummate the formalities of the transaction at a time when Shahmoon was leaving on company business and could not himself complete the contract; Shahmoon told Djedda all of the terms of the deal, including prices. Again, when Shahmoon was unable to go to Alan Wood Steel, he introduced Djedda to Alan Wood’s executives and sent him there to conclude the contract, giving him all of the terms and conditions which had been negotiated by Shahmoon.