Callman **GOTTESMAN** et al., Plaintiffs,

v.

**GENERAL MOTORS CORPORATION**
and E. I. du Pont de Nemours &
Company, Defendants.

No. Civ. 121–251.

United States District Court
S. D. New York.

Dec. 13, 1967.

O'Connor & Farber, Gordon, Brady, Caffrey & Keller and Netter, Netter, Dowd, Fox & Ness, New York City, for plaintiffs; David Brady, Leo Brady, Clendon H. Lee, Arthur B. Netter, Henry L. Bayles and Abbott Gould, New York City, of counsel.

Edward B. Wallace, New York City, and Henry M. Hogan, Detroit, Mich., for defendant General Motors Corporation; William A. Grier and John J. Higgins, New York City, John R. Anderson and Aloysius F. Power, Detroit, Mich., of counsel.

Covington & Burling, Washington, D. C., and Littauer, Gordon, Ullman & Riseman, New York City, for defendant E. I. du Pont de Nemours & Company; Hugh B. Cox, Daniel M. Gribbon and Harris Weinstein, Washington, D. C., Frank H. Gordon, New York City, and Irving S. Shapiro, Wilmington, Del., of counsel.

METZNER, District Judge.

■ This is a derivative action brought by minority stockholders of General Motors Corporation (General Motors) against E. I. du Pont de Nemours & Company (du Pont) claiming damages flowing from alleged violations of §§ 1 and 2 of the Sherman Act[1] (15 U.S.C. §§ 1, 2) and breach of common law fiduciary duty.[2] It is alleged that, by reason of du Pont's stock interest in General Motors, it dominated and controlled the latter in the purchase of du Pont products. The court has jurisdiction of the subject matter of the action and of the parties.[3]

The case at bar, by stipulation of counsel, has dealt only with the question of liability on the claims pertaining to automotive fabrics and finishes used in the manufacture of passenger cars.[4] Some 10,000 pages of testimony have been taken and 1,000 exhibits admitted into evidence.

The primary issues here are whether du Pont after May 4, 1950 controlled General Motors to the extent that it entrenched itself as the primary supplier to the latter of automotive fabrics and finishes, that it insulated the General Motors market from free competition in these products, and that as the result of such activity it caused injury to General Motors.

An essential part of the background of this lawsuit is the first Supreme Court opinion in an antitrust action brought by the United States against du Pont, General Motors et al. See United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed. 2d 1057 (1957).[5] The Government, in that action, alleged violations of § 7 of the Clayton Act[6] (15 U.S.C. § 18) and §§ 1 and 2 of the Sherman Act. The

---

1. § 1 of the Sherman Act provides:
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."
 § 2 of the Sherman Act provides:
 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, * * * shall be deemed guilty of a misdemeanor * * *."

2. The court has previously determined that plaintiffs may not maintain a claim under § 7 of the Clayton Act. 221 F. Supp. 488.

3. Plaintiff Mattiello was not a stockholder at the time of trial, and consequently her claim is dismissed. Sorin v. Shahmoon Indus., Inc., 30 Misc.2d 408, 429, 220 N.Y.S.2d 760, 780 (Sup.Ct.1961).

4. Claims were also asserted concerning fluoride compound refrigerants (Freon), refrigerator finishes and tetraethyl lead.

5. In a later opinion the Court determined that the proper remedy was divestiture by du Pont of its stockholdings in General Motors. United States v. E. I. Du Pont De Nemours & Co., 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961).

6. § 7 of the Clayton Act provides:
 "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital * * * of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be

Court found that § 7 of the Clayton Act had been violated; it did not pass upon the claimed violations of Sherman 1 and 2,[7] and the district court judgment dismissing those claims was vacated.[8] The Court found that at the time of the suit, June 30, 1949, the stock ownership acquired in 1917 had a "reasonable probability to contain a threat that it may lead to a restraint of commerce or tend to create a monopoly of a line of commerce." [9] 353 U.S. at 597, 77 S.Ct. 872. In arriving at this conclusion, the Court noted that

> "du Pont purposely employed its stock to pry open the General Motors market to entrench itself as the primary supplier of General Motors' requirements for automotive finishes and fabrics." 353 U.S. at 606, 77 S.Ct. at 884.

Both the majority and dissenting opinions agreed that to find a violation of § 7 it need not be shown that restraint or monopoly was intended, nor that actual anticompetitive effects flowed from the acquisition. The Court stated that:

> "[T]he fact that all concerned in high executive posts in both companies acted honorably and fairly, each in the honest conviction that his actions were in the best interests of his own company and without any design to overreach anyone, including du Pont's competitors, does not defeat the Government's right to relief. It is not requisite to the proof of a violation of § 7 to show that restraint or monopoly was intended." 353 U.S. at 607, 77 S.Ct. at 884.

There was no finding of private injury either to the competitors of du Pont or to General Motors itself. The thrust of the opinion was directed to show the probability of public injury based on events quite far removed from the time period with which we are concerned herein. Recently the Court indicated that a finding of control was not necessary for its decision in the *du Pont* case. Denver & R. G. W. R. R. v. United States, 387 U.S. 485, 501, 87 S.Ct. 1754, 18 L.Ed. 2d 905 (1967). All of this leads to the conclusion that the Court's language about entrenchment is not entitled to great weight as prima facie evidence in this case.

Liability on both the antitrust claims and common law claims is limited to the period commencing with May 4, 1950 (28 F.R.D. 325). As indicated, the Government suit speaks as of June 30, 1949. The time period encompassed in the Government suit has been deemed relevant in this trial, however, to place the facts in dispute here in historical perspective.

### The Relationship Between the Corporations

The history of the relationship between du Pont and General Motors covers a period of 45 years, going back to 1914 when Pierre S. du Pont, Irenee du Pont and John J. Raskob individually purchased shares in General Motors. In 1917, on Raskob's recommendation (he was treasurer of du Pont), the du Pont Company decided to acquire $25,000,000 worth of the common stock of General Motors, which amounted to approximately 23% of the outstanding issue. Subsequent transactions first increased and then decreased the percentage of stock owned by du Pont. By 1939 it was back to 23% and remained at that figure

---

substantially to lessen competition, or to tend to create a monopoly."

**7.** 353 U.S. at 588 n. 5, 77 S.Ct. at 875. "In view of our determination of the case, we are not deciding the Government's appeal from the dismissal of the action under the Sherman Act."

**8.** 366 U.S. at 335, 81 S.Ct. 1243, 6 L.Ed. 2d 318.

**9.** The Court rejected the argument that § 7 is applicable only to acquisition of the stock and not to the holding or subsequent use of the stock. "Its [Clayton Act's] aim was primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil, which may be at or any time after the acquisition, depending upon the circumstances of the particular case." 353 U.S. at 597, 77 S. Ct. at 879.

through the period covered by this lawsuit.

Raskob's report to the Finance Committee of du Pont in 1917, which was the basis for the decision to purchase General Motors stock, gave several reasons, in addition to the investment potential, to justify the purchase. They were:

"1. With Mr. Durant we will have joint control of the companies.

\* \* \* \* \* \*

"5. Our interest in the General Motors Company will undoubtedly secure for us the entire Fabrikoid, Pyralin, paint and varnish business of those companies, which is a substantial factor."

William C. Durant at the time controlled just over 50% of General Motors stock.

By 1917 du Pont had already acquired the Fabrikoid Company (1910), the largest manufacturer of artificial leather in the country; the Arlington Company (1915), one of the two largest manufacturers of celluloid in the country; the Fairfield Rubber Company (1916), a manufacturer of rubber-coated fabrics for automobiles, whose principal customer was the Ford Motor Company; the Harrison Brothers & Company, Inc. (1917), the Beckton Chemical Company (1917), and the Bridgeport Wood Finishing Company (1917). The three latter companies manufactured paints and varnishes.

In 1918, after the acquisition of the General Motors stock, du Pont purchased the controlling interest in Flint Varnish & Chemical Works, which had been supplying almost all the paint requirements of Buick, Oakland, Olds and Chevrolet, components of General Motors. Flint also sold to other automobile manufacturers. By 1920 the Flint company could not meet the demand of General Motors and its other customers, and business was being lost to competitors of du Pont. In order to enlarge its paint product capacity, du Pont purchased the majority interest in the Chicago Varnish Company.

By reason of du Pont's purchase of the original 23% stock interest, it nominated six members of the 20-member Board of Directors of General Motors. During the period 1920 to 1923 the number of directors was increased to 31, but the number of du Pont nominees remained at six. During the same period the committees of the board of General Motors consisted of the Finance Committee and the Executive Committee, both of which were controlled by du Pont nominees.

In 1920, because of personal financial difficulties, Durant was forced to liquidate his interest in General Motors. As a result du Pont increased its holdings in General Motors to 38% of the common stock. Pierre du Pont became president of General Motors in order to more closely supervise its financial operations. He resigned in 1923 when he felt this objective had been achieved. During his tenure as president of General Motors he was also chairman of the Board of Directors of both General Motors and du Pont.

In 1921 Raskob indicated that point one of his 1917 memorandum was more than achieved with Durant's departure. In a report to the directors of du Pont on its investment in General Motors, he stated: "As the Directors know we are now in control of the company and are completely responsible for its politics and management \* \* \*." I find that, up to the time in 1923 when Pierre du Pont resigned as president of General Motors, du Pont had active control of General Motors.

With the election of Alfred P. Sloan as president of General Motors in 1923, a distinct change took place. He had been a member of the Board of Directors of General Motors since 1918, when a corporation of which he was president was purchased by General Motors. Sloan proved to be an outstanding executive. He developed the top management of the corporation into two distinct groups, financial and operational. The Board of Directors maintained its over-all jurisdiction of management, but the basic

work was done by two of its committees —Executive and Finance. The Executive Committee concerned itself with operations and management of the business. The Finance Committee dealt with the availability and allocation of capital for operating the business, review of earnings for the purposes of recommending dividend policy, and administration of the bonus plan. The make-up of these committees will be discussed below.

Sloan was subsequently elected a member of the Board of Directors of du Pont, but he attended meetings infrequently and was not active in the operations of the company. His membership on the du Pont board did not make him a captive of du Pont, and it did not affect the decisions he made in connection with his responsibilities to General Motors. On the other hand, it was natural for him to consult with persons in control of such a large block of stock in his company. He conferred with du Pont regarding potential members of the Board of Directors and the committees of General Motors which dealt with financial policy.[10] Over the years, du Pont's designees for membership on the General Motors board were chosen, with one exception, from members of du Pont's Finance Committee. Sloan suggested the names of persons to fill management positions on the board. When it came to selecting members from outside these two groups, Sloan would consult with various members of the board, and when he received the acquiescence of a large number of members, the formal nomination and election would follow.[11]

Aside from the designation of the six persons (later reduced to five) to represent du Pont on the Board of Directors, no person was placed on the board because of insistence by du Pont. In fact, many of the suggestions made by du Pont for nonmanagement directors of General Motors were rejected. It is clear that du Pont's reactions to suggested changes or elevation of General Motors personnel to top level management were based solely on what was best for the successful operation of General Motors.[12] The correspondence contains evaluations and reactions in depth when

10. W. S. Carpenter, Jr., president of du Pont, once wrote to Sloan: "I think his [Lammot du Pont's] reasons for this are consistent with the position he has always taken, namely, that the du Pont representatives should not become too closely involved in the operating problems of General Motors, principally because of their lack of experience in such problems in General Motors."

11. An interesting sidelight concerning the question of du Pont's control of General Motors is found in events surrounding Raskob's resignation in 1928 from the board of General Motors and as chairman of its Finance Committee. At the time Pierre du Pont was chairman of the Board of Directors. Raskob and du Pont became actively engaged in the campaign of Alfred E. Smith for President that year. Sloan was of the opinion that partisan political activity was detrimental to the interests of General Motors and its relationship to the buying public. This was especially true regarding Raskob, who was identified in the public mind as "Mr. General Motors." Sloan was successful, over the opposition of the du Pont nominees on the board, in forcing Raskob and du Pont to resign their positions. After the election they refused to return to their former positions despite the urging of Sloan.

12. The fact that du Pont's interest was directed toward the financial side of General Motors, rather than toward its operations, is reflected in much of the correspondence that deals with personnel in top management. An interesting observation is contained in a letter from W. S. Carpenter, Jr., president of du Pont, to Donaldson Brown, of General Motors. They had been discussing the capacities of several men, one of whom was Charles E. Wilson, who later was to become the president of General Motors. Carpenter wrote:

"Again I wish to stress that I do not in the slightest belittle Mr. Wilson's capacities. I do say, however, that I do not feel that he has had the background of experience that Mr. Sloan had, and for this reason I question whether he has the same sympathy with and appreciation of the financial aspects of a corporation that Mr. Sloan has. As Mr. Sloan has expressed it in referring to other people—'He has never had the job of meeting the payroll at the end of the week'."

discussing these matters. . There is no reference in this correspondence to business dealings between the two corporations as a factor in the advice given or the comments made. There is no evidence that the men chosen were in any way beholden to du Pont or were influenced by du Pont in the exercise of their duties.

There is no evidence in the record that after 1948 either Sloan or even his successors engaged in consultations with du Pont of the kind to which reference has been made.

Neither William S. Knudsen, Charles E. Wilson, Harlow H. Curtice nor Frederic G. Donner, who succeeded Sloan as either president or chairman of the board of General Motors, had ever been associated with du Pont. They had all come up through the ranks of General Motors and their advancement to the top was not as the result of the exercise of influence by du Pont.

The record shows the following composition of the Board of Directors during the period 1923–1958:

| | Total | du Pont | Management | Others |
|------|------|------|------|------|
| 1923 | 31 | 6 | 15 | 10 |
| 1942 | 26 | 6 | 17 | 3 |
| 1949 | 30 | 5 | 22 | 3 |
| 1953 | 34 | 5 | 23 | 6 |
| 1958 | 34 | 5 | 22 | 7 |

The Finance and Executive Committees functioned until 1937. During the period 1923–1937 du Pont's nominees on the board composed half of the membership of the Finance Committee, and less than a third of the membership of the Executive Committee.[13] In 1937 Sloan, over the objection of the du Pont nominees on the General Motors board, abolished these committees and created a single Policy Committee. It dealt with policy matters in both the financial and operational fields. At most, du Pont nominated three members of the nine-member Policy Committee, whose membership changed only once until the committee was abolished in 1946, when Sloan retired as chief executive officer. An Administration Committee was created, consisting of General Motors operating personnel, which acted in an advisory capacity to the Policy Committee. No du Pont designee on the board was a member of this committee.

In 1946 the functions of the Policy Committee were divided between two newly created committees—Operations Policy and Financial Policy—each of which continued until 1958. The functions of these committees were similar to the former Executive and Finance Committees except that the responsibilities of the latter regarding the operation of the bonus plan were lodged in a new Bonus and Salary Committee. Du Pont was represented by three nominees on the ten-member Financial Policy Committee. No du Pont nominee served on the Operations Policy Committee, which consisted of the heads of the operating divisions of General Motors.

There were no discussions at meetings of the board or any of its committees of the purchasing policies of the operating divisions, either as to source of supplies or allocations of purchases. Nor did they discuss engineering practices in the selection of materials to be used in building the automobiles. There is no proof that any du Pont nominee on the board ever used his position to influence decisions in either of these areas in the last 30 years.

*Control of General Motors by Du Pont*

In 1949 there were 44,104,340 shares of General Motors stock outstanding in the hands of 403,352 shareholders. Du Pont owned 23% or 10,143,998 shares. 92% of the stockholders owned no more than 100 shares each. During the period 1950–1959 du Pont's percentage of the total votes cast at the annual meetings ranged from 27.1% to 29.9%.

■ Corporate control is an inexact concept.[14] Certainly it carries with it *power* to direct corporate policy and con-

---

13. I consider Donaldson Brown a du Pont nominee.

14. See Bayne, A Philosophy of Corporate Control, 112 U.Pa.L.Rev. 22, 29 (1963)

siderable patronage.[15] According to a noted corporate scholar, " 'control' may be defined as the capacity to choose directors. As a corollary, it carries capacity to influence the board of directors and possibly to dominate it." Berle, "Control" in Corporate Law, 58 Colum. L.Rev. 1212 (1958).

■ Power to control through the election of directors may exist where a large block of shares, even though a minority, is owned by one group and the remaining shares are widely scattered. This is called practical or working control. In Insuranshares Corp. of Delaware v. Northern Fiscal Corp., 35 F. Supp. 22 (E.D.Pa.1940), the defendant was found to have practical control based on 27% ownership of stock. The court found that the majority of stockholders "bought for investment, [and] could be counted on to remain inert." 35 F.Supp. at 24.

In Perlman v. Feldmann, 219 F.2d 173 (2d Cir.), cert denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), Annot., 50 A.L.R.2d 1146 (1956), 68 Harv.L.Rev. 1274 (1955), the principal defendant owned 33% of the stock. The majority and minority opinions assumed this to be practical control.

In Essex Universal Corp. v. Yates, 305 F.2d 572, 13 A.L.R.3d 346 (2d Cir. 1962), two members of the panel agreed that 28.3% ownership of the stock of the corporation amounted to practical control. The court stated that it was "commonly known that equivalent power [to majority ownership] usually accrues to the owner of 28.3% of the stock." 305 F.2d at 575. It further stated that it was also

"commonly known that a person or group owning so large a percentage of the voting stock of a corporation which, like Republic, has at least * * * 1,500 shareholders * * * is almost certain to have share control

as a practical matter." 305 F.2d at 579.

The court placed the burden on the defendant to show otherwise.

It has been observed that the minority block interest has the power to control an election through the use of proxy machinery. Berle, supra, at 1213.

■■ The quantum of proof necessary to determine the existence or rebut the inference of control varies with the particular purpose of the law involved. Compare Acampora v. Birkland, 220 F. Supp. 527, 543 (D.Colo.1963) (under Investment Company Act, actual domination), with Pacific Gas & Elec. Co., 10 S.E.C. 39, 55 (1941), aff'd, 127 F.2d 378 (9th Cir. 1942), aff'd on rehearing by an equally divided court, 139 F.2d 298 (1943), aff'd by an equally divided Court, 324 U.S. 826, 65 S.Ct. 855, 89 L. Ed. 1394 (1945) (under the Public Utility Holding Company Act, "control" includes power to control, and "controlling influence" includes susceptibility to domination), and SEC v. R. A. Holman & Co., 377 F.2d 665 (2d Cir. 1967) (under SEC rule 10b–6). Even if a holder of a large block of stock in a corporation whose shares are widely held does not exert full control, it may be inferred that management consults such an outside group. See Hill, The Sale of Controlling Shares, 70 Harv.L.Rev. 986, 996 & n. 28 (1957).

■ I have come to the conclusion that du Pont, by reason of its 23% stock interest in General Motors, had the power to control that corporation because of the unrelated ownership of the balance of the shares.

It has been said:

"It is difficult to see how du Pont could have had this unquestioned power over General Motors' finances without at the same time exercising, *or having the power to exercise,* what is broadly understood as control over

(law has never advertently defined it). Compare 15 U.S.C. § 80a–2(a) (9) (Investment Company Act—25% or more presumption of control).

15. See Manne, Some Theoretical Aspects of Share Voting, 64 Colum.L.Rev. 1427, 1430 (1964).

other phases of the business. But there is also present in the correspondence reproduced in the briefs evidence of a division of responsibility between du Pont and the General Motors management. Control of finances is not the same thing as control of operations or purchasing." Dirlam & Stelzer, The Du Pont-General Motors Decision: In the Antitrust Grain, 58 Colum.L. Rev. 24, 33 (1958) (emphasis added).

### The Antitrust Claims

The foregoing analysis suggests the problems that must be determined in this case. Did du Pont, which had the power to control, exercise that power, in violation of §§ 1 and 2 of the Sherman Act, in the purchases by General Motors of automotive fabrics and automotive finishes, and if it did, was General Motors injured thereby?

■ In discussing the antitrust features of this case, "commerce," "relevant market" and "substantiality" must be determined. The Supreme Court found that "automotive finishes and fabrics have sufficient peculiar characteristics and uses to constitute them * * * a 'line of commerce' within the meaning of the Clayton Act." 353 U.S. at 593–594, 77 S.Ct. at 877. It is evident that automotive fabrics and finishes are not reasonably interchangeable for use for the same purpose. Cf. United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395 & n. 23, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Brown Shoe Co. v. United States, 370 U.S. 294, 325–328, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Each must be a separate line of commerce, since fabrics are used in the interior of cars for trim, upholstery and seat covers, while finishes are used on the exterior of the cars. Each is part of commerce for purposes of the Sherman Act.[16]

The relevant market is the automotive industry, which is a substantial market. The range of annual production of cars was between 4,258,000 and 7,920,000 during the years in question. General Motors' share of that market was substantial, varying between 41% and 52.7%. Du Pont's share of General Motors' purchases of automotive fabrics and finishes was substantial.[17] It averaged 21% for fabrics and 74% for finishes.

■ In order to establish a restraint of trade in violation of § 1 or a monopolization in violation of § 2, plaintiffs must at least show that du Pont, by virtue of its stock ownership, entrenched itself as a supplier to General Motors of automotive fabrics and finishes, so that a competitor of du Pont could not have captured any of the business by offering equal price, quality and service. Cf. International Salt Co. v. United States, 332 U.S. 392, 396–397, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

■ Plaintiffs' right to succeed on the issue of liability does not ripen solely on proving the public injury of restraint or monopolization. This is a private suit and plaintiffs must also prove injury to General Motors flowing from antitrust violations. § 4 of the Clayton Act (15 U.S.C. § 15).

### Alleged Historical Patterns of Control

Plaintiffs contend they proved that general patterns of control by du Pont of the purchasing practices of General Motors were established in the 1920s and continued during the years involved in this litigation. This proof, with few exceptions, does not deal specifically with automotive fabrics and finishes.

A. Plaintiffs maintain that du Pont directed purchasing practices of General Motors.

An examination of the operational structure of General Motors indicates

---

16. In United States v. Grinnell Corp., 384 U.S. 563, 573, 86 S.Ct. 1698, 1705, 16 L. Ed.2d 778 (1966), the Court said that there is "no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act."

17. The definitions of automotive fabrics and finishes as agreed upon by the parties are limited to passenger cars. This is a much more restrictive use of the terms than in the Government suit, and makes some of the statistical data in the latter unusable here.

that such direction would have been difficult, and in fact did not exist. Sloan's organizational plan called for decentralization of authority in the field of operations. Cadillac, Buick, Chevrolet, Olds (later Oldsmobile), Oakland (later Pontiac) and Fisher Body were independent operating divisions of General Motors and were headed by general managers. A general manager had the authority and responsibility of a chief executive of an independent corporation. He was judged by the results achieved. The policy of decentralization was carried down through each division, giving subordinates who headed up an operation broad responsibility along with the authority necessary to carry out that responsibility. This plan of organization existed through the period with which we are concerned.

If du Pont exercised such control as claimed by the plaintiffs, its level of success in selling to General Motors should have exceeded by far what the evidence shows in this case. This would be especially true in those years when antitrust implications of a relationship did not receive the attention that they do today.

The record contains many instances which support just the opposite of plaintiffs' proposition, and sustain the independence of each General Motors operating division. Here are a few examples.

Plaintiffs' witness, John F. McWhorter, the assistant to the technical director at the Inland Division of General Motors, bought paint from du Pont, but without pressure being brought on him as to where he should purchase the material. He only approved the product after testing it. On the other hand, Maurice J. Gordon, another of plaintiffs' witnesses, supplied McWhorter with a paint manufactured by Forbes Varnish Company for use on running boards, which McWhorter found superior to du Pont's paint and less expensive. McWhorter gave Forbes the bulk of this business. Gordon was also successful in supplying paint for steering wheels and motor mounts at Inland and coating for ice cube trays at the Frigidaire Division of General Motors.

For years du Pont could not sell its coated fabric for diaphragms for fuel pumps to General Motors' AC Spark Plug Division. Du Pont did sell this fabric to Carter Carburetor Company, which was so successful in using the material that it took business away from AC Spark Plug at Ford and Chrysler. Finally, in 1958 AC Spark Plug began to purchase the material.

General Motors' Delco-Remy Division, located in Indiana, bought most of its paint requirements from du Pont's competitors whose plants were nearby. The Harrison Radiator Division of General Motors bought all of its paint requirements from competitors of du Pont.

Du Pont manufactured materials other than fabrics and finishes which were sold to the automotive industry. It was unable to sell Fisher Body more than 3% of Fisher's million dollar requirements for weather stripping cement. Other du Pont materials included antifreeze, plastics, electrochemicals, rubber chemicals and neoprene. The record shows that du Pont's success or lack of success in selling these products to General Motors from 1930 on reflects the independence exercised by each of the divisions of General Motors in their engineering and purchasing policies and practices.

Plaintiffs rely heavily on the fact that General Motors was du Pont's prime customer for both fabrics and finishes, far exceeding the volume of business du Pont received from Ford and Chrysler, the other two large manufacturers of automobiles. The details of this relationship will be discussed later on in this opinion. But it may be useful here to explain du Pont's comparatively minimal relationships with Ford and Chrysler.

Near the end of the 1930s, Henry Ford issued instructions that Ford was not to purchase material from du Pont, and as a result du Pont lost undercoat and topcoat enamel business to competitors. In 1945 Henry Ford II rescinded

these instructions and du Pont began to sell topcoat enamels to Ford. Ford manufactures most of its own requirements in the finishes field. When du Pont developed Dulux 100, it had some success in selling to Ford, but when the latter developed a similar enamel of its own, the volume of du Pont's sales to Ford decreased as the latter's own plant furnished the bulk of its requirements.

As for Chrysler, it took the position in the early 1930s that its best interests would be served if it could find a supplier to whom it would be the principal customer. For many years Ditzler supplied the majority of Chrysler's requirements in finishes, and was succeeded in this position by Cook Paint & Varnish Company.

B. Plaintiffs contend that monetary rewards were used to pressure operational decisions favorable to du Pont.

In 1923 General Motors had a cash bonus plan in operation for its employees, which continues today. Recommendations for recipients of a bonus were made to Sloan by the heads of various divisions. Sloan made the final selections with approval of the Finance Committee until 1937, and after that with approval of the Bonus and Salary Committee. Even though a majority of the members of both committees were du Pont nominees through 1946,[18] they always accepted Sloan's selections. This was due to the fact that the members of the respective committees were not in a position to evaluate the contributions of the thousands of employees who received bonuses each year.

In 1923 the Managers Securities Plan was adopted. It provided for the purchase of General Motors stock by top management personnel. The plan was formulated at the instance and with the aid of du Pont. Its purpose was that of all corporate incentive plans for management—to attract and hold able employees and add to their interest in making the business a successful one.

The plan provided for du Pont to form a corporation known as General Motors Securities Company, whose sole asset was the 7,500,000 shares of General Motors owned by du Pont. General Motors formed a corporation known as Managers Securities Company. The latter purchased 30% of the shares of General Motors Securities Company, which represented 2,250,000 shares of General Motors stock. This was about the amount of stock that du Pont had purchased in 1920 as the result of Durant's financial predicament. The purchase price was the then market price of the General Motors stock. Payment was spread over a number of years and was guaranteed by General Motors. Voting rights in the 2,250,000 shares of General Motors stock were retained by du Pont during the plan's operation.

The Board of Directors of General Motors appointed three of its members to a special committee for the purpose of selecting the personnel who would participate in the plan. Only one of the three was a du Pont representative. The original selections were reviewed with Sloan and his recommended changes were accepted by the committee. A person selected to participate paid for his stock in Managers Securities Company (the purchase price being keyed to the current market price of General Motors stock) by (1) making a 15% down payment in cash, (2) crediting his allotment from the general bonus plan, and (3) being credited with the dividends received by General Motors Securities Company on the General Motors stock. Some 97 executives were chosen for participation, the last in 1926, and the plan expired in 1930. Its dissolution covered the period 1930–1938.

From hindsight this turned out to be a fabulous investment for the selectees who accepted the offer to participate and held on to their stock, but at the time of its inception it had the risk of any investment. After all, only three years before (1920) General Motors was in dire

---

18. After 1946 du Pont nominees were in the minority.

straits and this could have happened again.

The Managers Securities Plan was succeeded by the General Motors Management Corporation Plan, which operated from 1930 through 1936 and was "under water" in the middle of its operation. The stock for the operation of this plan was not purchased from du Pont, but was acquired from General Motors. From 1937 on, top management received rewards solely under the general bonus plan, which did not have a stock purchase feature.

There is no evidence that any of the plans were used to influence General Motors personnel in their business relationships with du Pont or that they were so influenced.

C. Plaintiffs claim that General Motors personnel who were formerly connected with du Pont dictated General Motors' policy in favor of du Pont.

When du Pont originally purchased General Motors stock, it arranged for J. A. Haskell to be, its liaison man with General Motors. He became a vice president, director and member of the Executive and Finance Committees of General Motors while maintaining his position as a vice president and director of du Pont. He died in 1923. Haskell made several efforts to be helpful to du Pont in selling products to General Motors, but there is no proof that he was successful. For example, when he inquired of Oakland as to why it did not buy from du Pont, he was told that du Pont's prices were too high.

As indicated above, Pierre du Pont, in the period 1920–1923, was president and chairman of the board of General Motors, and at the same time he was chairman of the board of du Pont. In 1921 he obtained from du Pont its records as to sales of products to General Motors, which showed that Olds was purchasing only part of its Fabrikoid requirements from du Pont, that Cadillac and Oakland were purchasing only part of their paint and varnish requirements from du Pont, and that Fisher Body did not purchase any of its paint and varnish requirements from du Pont. He observed, in a letter to Lammot du Pont, vice president of du Pont, that:

"With the change in management at Cadillac, Oakland and Olds, I believe you should be able to sell substantially all of the paint, varnish and fabrikoid products needed; especially is this true of Cadillac.

"A drive should be made for Fisher Body business. Is there any reason why they have not dealt with us [du Pont]?"

It is not evident from the record whether Pierre du Pont attempted to influence the purchases by Cadillac, Olds and Oakland or merely hoped that the changes in management would bring about a happy result. Parenthetically, it should be noted that the changes in management did not result from any desire to benefit du Pont. The men who left Cadillac, Olds and Oakland did so for reasons completely unconnected with the change in the top management of General Motors. Their replacements were longtime employees of General Motors who were selected by Sloan on the basis of merit.

The record shows that in 1923 Lammot du Pont made direct appeals to Cadillac to use du Pont paint products manufactured at the Flint plant. Cadillac, while expressing a desire to use the Flint products, maintained its position that "we feel we should go most cautiously in any change in paint, adopting new things only after long trial." The answer from du Pont says, "we will look forward to a time when the Flint products have proved their value to you." Cadillac continued to purchase most of its paint and varnish requirements from other sources until 1926 when it started to use lacquer finishes on its cars, and purchased Duco, a du Pont product which was only in an experimental stage in 1923. I will discuss Duco later in this opinion. However, in 1927 Cadillac and Olds began to purchase the major portion of their lacquer requirements from paint manufacturers other than du Pont.

Oakland increased its volume of purchases from du Pont in 1924 only because

it decided to try Duco in an effort to bolster lagging sales of its automobile. The decision had no relation to any efforts on the part of du Pont to obtain the business because of the relationship between the companies.

As for Fisher Body, arrangements had been made in 1921 for Fisher to test du Pont's paints and varnishes. In October 1922 Lammot du Pont wrote directly to Fred Fisher, president of Fisher Body, complaining that the Flint plant was not getting any substantial amount of business in paints or varnish from Fisher. He stated that in view of the stock ownership relationship between the companies Flint "should enjoy a large part, if not all, of Fisher Body's paint and varnish business, unless there is some good reason for not having it." Fisher did not reply to this letter and a second letter was written suggesting a conference. This letter also went unanswered and a telegram was sent suggesting a meeting during the auto show in New York. This was followed the next day by another telegram suggesting a definite meeting before the General Motors directors' meeting the following Monday. The meeting took place, but it does not appear to have effected any change in Fisher's purchases from du Pont until Fisher, too, turned to Duco as a finish for bodies in 1925.

John Pratt and James Lynah had been with du Pont for a number of years before going to General Motors. While Pratt could be considered du Pont oriented, and at times he attempted to be helpful to du Pont with people in the various General Motors divisions (sometimes successfully, sometimes not), the testimony shows that his first allegiance was to General Motors.[19] For example, he advised du Pont that it could create better relations with General Motors' purchasing agents if it voluntarily reduced

prices whenever it could rather than have the purchaser force a reduction. On the other hand, he advised the Canadian Division of General Motors to purchase finishes from sources of supply that would undersell du Pont in Canada. In that letter Pratt referred to giving thinner business to a competitor of du Pont "as a disciplinary measure to bring down the price of Duco and thinner." Finally, he opposed the proposal made in 1926 that General Motors furnish its production schedules to du Pont. He wrote:

> "[T]he DuPont organization will be a better organization for us to do business with when they realize they must stand on their own and expect to get business and hold same from General Motors Corporation on the same basis that we try to treat all of our suppliers —three considerations—namely, quality, service and price."

As for Lynah, his experience as an employee of du Pont was not a happy one and he resigned his position there as the result of what he considered unfair treatment. His attitude while with General Motors was that of complete loyalty to the interests of his employer.

Finally, the great majority of instances relied on by plaintiffs to show that influence was exercised on behalf of du Pont occurred prior to 1924 while Pierre du Pont was president of General Motors.

D. Plaintiffs claim that the "two sources of supply" policy froze du Pont's share of the General Motors market.

In 1923 each division of General Motors began to develop two sources of supply for all essential materials used by the division. With the increased production of automobiles, sound business judgment dictated that supplies in sufficient quantities always be available without the inherent risks of reliance on a single supplier. This policy applied to all pur-

19. In attempting to help du Pont sell paint to Delco-Light Company, a subsidiary of General Motors, Pratt urged that du Pont receive a major share of requirements if quality, price and service were equal to that of other suppliers.

He cautioned, however, that a second supplier also be used in order to maintain a competitive situation. In this instance du Pont ultimately received the business because its price was lower.

chases made by General Motors. In the fabric field, for example, du Pont had been furnishing all of General Motors' requirements of leather substitute and rubber-coated fabrics, and General Motors was satisfied with the quality and extraordinary service which du Pont had provided. The General Motors people agreed that their divisions "should purchase 20% of their leather substitute and top materials from one of [du Pont's] competitors, leaving [du Pont] 80% of their consumption at prices which would be determined by competition." Shortly thereafter the General Purchasing Committee of General Motors (which will be discussed below) raised the amount of fabrics business that should be placed with sources other than du Pont to 25%.

In addition to the inherent risks of reliance on a single supplier, General Motors desired to dispel any belief on the part of du Pont's competitors that no matter what price they quoted they would not receive any business from General Motors. The "two sources of supply" policy enabled a competitive pricing situation to develop which would redound to General Motors' advantage.

Du Pont complained, in a letter to Pierre du Pont, as president of General Motors, that for the last six months of 1923 it lost 25% of the Chevrolet top business. Pierre du Pont replied that he disagreed with the "two sources of supply" concept. He wrote:

"I think the duPont Company indulges in this foolish practice, as well as General Motors. At any rate I do not think it advisable to interfere in any case unless the Executive Committee of the company outlines a policy advocating one source of supply generally where such course seems advisable.

"As to the policy of General Motors, I cannot refuse permission to Mr. Knudsen if he wishes to divide his orders for Fabrikoid. I do not approve of the policy or of this particular act."

Initially the "two sources of supply" policy reduced du Pont's share of the General Motors market for its products. Thereafter it did not operate as a freeze of the reduced percentage, nor was it intended to do so.

E. Plaintiffs contend that the General Purchasing Committee of General Motors was used as an instrument to assure du Pont of General Motors' business.

Sloan created the General Purchasing Committee in December 1922 and it lasted until 1931. While he was the advocate of decentralization of the activities of the corporation, he also realized that the corporation's huge purchasing power could be used to advantage in obtaining lower prices for materials. It could also result in standardization of parts. He wrote to the person charged with developing a plan of operation:

"It was not my idea that we would in any sense centralize purchasing. As a matter of fact it is not my idea to centralize anything * * * What I am for * * * is that everything should be done to capitalize to the benefit of the stockholders every advantage that lies to General Motors on account of the magnitude of its operations."

The committee was selected by Sloan, who became its first chairman, serving until December 1924. The members were operating personnel from various divisions along with Pratt and Lynah, who was secretary of the committee. The committee stated that its object was

"to so co-ordinate the total purchasing power of the Corporation that the most logical and economic condition will result and the benefits of concentrated purchasing be realized without destroying in any real sense the effectiveness or merit of any individual purchasing unit."

In order to achieve the goals of the committee, contracts had to cover items required by more than one division and result in substantial savings. Specifications of an item were standardized after consultation with the divisions, and the latter could suggest suppliers who should be invited to bid on the item. After a general contract was made, the divisions were required to participate in it unless exempted. If an exemption was request-

ed by a division, it was usually granted by the committee.

The first general contract with du Pont was entered into about two years after the formation of the committee and was numbered 148. About six months later came the second du Pont contract, numbered 198. During the life of the committee, out of 709 general contracts entered into, 14 were with du Pont and 30 with competitors of du Pont. 342 requests for general contracts were rejected, 13 of which involved du Pont.

General Motors refused to change its purchasing practice of requiring du Pont to fill orders as they were placed, without any advance estimates as to what General Motors' requirements would be. This practice put the risk of a sudden slump in the motor industry on du Pont, which could be left with a large unsold inventory. General Motors knew that every one of its suppliers assumed this risk when taking on a General Motors contract, and it believed that du Pont should not be treated differently.

Du Pont was also advised at this time that it was to make its best price in the initial offer and not to count on the opportunity to meet competitive prices, "and that on the basis of competitive prices the Divisions were free to place their business to the best advantage."

The evidence does not sustain any finding that the General Purchasing Committee either protected any existing relationship with du Pont regarding purchases of the latter's products, or was used to further du Pont's interest in selling to General Motors. Du Pont received the same treatment as any other supplier. The committee operated as initially conceived, to capitalize to the utmost on potential savings to General Motors. It was independent and free of any influence by reason of du Pont's stockholdings in General Motors or membership on its Board of Directors or its committees.

■ In summary, no patterns of control by du Pont over purchases by Gen-

eral Motors had evolved in the period prior to 1950. We now turn to the specific product lines in this case, with particular reference to General Motors' purchases in the relevant time period.

*Finishes*

Automotive finishes on this trial have been defined by counsel as referring only to those used on passenger cars. They consist of topcoats, undercoats and thinners. Topcoats are principally nitrocellulose lacquers, acrylic lacquers and alkyd resin enamels. Du Pont manufactured nitrocellulose lacquer under the trade name "Duco," acrylic lacquer under the trade name "Lucite," and alkyd enamel under the trade names "Dulux" and "Dulux 100." Undercoats are primers, sealers, surfacers and primer-surfacers. Thinners are clear liquid solvents that are used for reducing various finishes to proper working consistency. Other manufacturers produced the same types of finishes.

In the early years varnish was used as a topcoat to finish cars, but the industry was plagued with problems inherent in using this finish. It took three to four weeks to apply and dry, with the resultant need for huge storage areas. One of the Fisher brothers said at the time that if the problem was not solved the whole state of Michigan would have to be used to store cars. The time factor caused capital to be tied up in inventory. When a car was sold, the purchaser was fortunate if the finish lasted a year.

In 1920 du Pont developed Duco, the nitrocellulose or pyroxylin based lacquer which was considerably quicker drying and more durable than varnish. The new paint made possible the use of a wide range of colors.[20] At about this time General Motors had a committee working on the problem of developing a quick-drying paint. It approached du Pont and other paint manufacturers for help. It engaged in continuous testing of the materials. Edmund M. Flaherty and Richard C. Williams, du Pont employees,

---

20. Up to that time black was the usual color of a car finish. Ford said you could use any color "as long as it was black."

worked with the General Motors people. Flaherty was the inventor of Duco and was in charge of its commercial exploitation. Sloan told Flaherty that he was aware of Duco's possibilities, but that Flaherty would have to convince the heads of the car divisions, since they would be the persons to make the final decision.

While du Pont continued extensive experimentation to improve Duco, General Motors worked on methods for its application as a topcoat. In 1923 Oakland was in a bad financial situation and decided to use Duco on its 1924 model in an attempt to enhance its sales. The use of Duco as a finish proved to be a success which included an impressive reduction in drying time—from four weeks to four hours. Each General Motors division head by independent consideration of the merits of Duco arrived at his own decision to use the product. Buick tested it extensively before adopting it as a finish in 1925. Cadillac advised a go-slow approach in using a new method of painting "before it had been tried out in every conceivable fashion." By 1926 Cadillac and the other divisons were using Duco.

General Motors was so interested in Duco that it wrote to du Pont requesting "that all negotiations with other possible consumers be stopped and also the plans for selling these products on the open market" until the two parties could determine whether General Motors could obtain the entire output. The letter concluded with the statement that, "The importance of this subject is so great as to warrant the careful attention of your best men until proper arrangements are made." Du Pont replied that it was embarrassed by such a request since rumors were spreading about the value of the product. If it refused sales to other customers, they might retaliate by refusing to buy du Pont products. In addition, du Pont knew that a similar product· was being developed by competitors who might be able to fill the demand, thereby creating future selling problems for du Pont. In 1925 every car manufacturer except Ford and Chrysler was using Duco, and several years later Chrysler also joined the list for a time. The testimony overwhelmingly supports the conclusion that the initial decisions by the General Motors divisions to use Duco were wise ones.

While the several car divisions were in the transitory period of change-over to Duco, the General Motors General Purchasing Committee continually sought other possible sources of supply of lacquer topcoats. These sources were developed by the late 1920s and became the primary suppliers to Cadillac, Oldsmobile and Fisher.

For several years after 1926 all major car manufacturers except Ford continued to use Duco as a topcoat. In addition to General Motors, the list included Hupmobile, Cleveland, Chalmers, Franklin, Harmon, Chrysler, Nash and Moon. Over the years competition forced many of these manufacturers out of business. Chrysler eventually joined Ford in using enamels. In 1953 Duco was still being sold to Packard, Hudson and Crosley, in addition to divisions of General Motors. However, Cadillac and Oldsmobile purchased most of their lacquer requirements from other paint manufacturers.

Du Pont continued its research to make improvements in Duco both as to durability and range of colors. After World War II it concentrated on developing a new paint product, since it was of the opinion that Duco had reached its limit in scientific development. The new paint was an acrylic lacquer which du Pont called Lucite. After extensive testing General Motors started to use Lucite experimentally in 1955 and by 1958 all of its divisions had switched to acrylic lacquer. During the period in which Lucite was being tested, General Motors advised du Pont that it would use the product only if alternate sources of supply could be developed, and if necessary du Pont would have to license other manufacturers to create such sources.

In the period covered by this action, the three largest manufacturers of automobiles were General Motors, Ford and

Chrysler. General Motors used Duco and then Lucite, which were lacquers, while Ford and Chrysler used enamel.

Since plaintiffs claim that General Motors purchased lacquers because of du Pont control, it is necessary to compare the relative merits of each finish. This is also important in view of the fact that du Pont manufactured and sold topcoat enamel at a price of about a dollar a gallon less than lacquer in the early 1950s, and at a price of about 75 cents a gallon less than lacquer in the late 1950s.

General Motors observed the relative merits of each product, since Chevrolet used lacquer on its passenger cars and enamel on its trucks. Plaintiffs did not produce either a paint manufacturer or an automobile manufacturer to testify as to their opinions. There were several large paint manufacturers who produced finishes and did not sell them to General Motors. As stated, Chrysler and Ford used enamel. The only credible evidence adduced on this trial as to the comparative advantages of using lacquer instead of enamel on passenger cars came from defendants' witnesses.

Enamel had a higher initial gloss than lacquer. Thus it was not necessary for a car finished in enamel to be rubbed on the assembly line, a procedure necessary for a lacquer finish. Ovens capable of producing high temperatures were needed to create the hard protective film of an enamel finish. Enamel finishes were more prone to chipping on the assembly line. The repair of chipped enamel finishes before the cars left the factory required separate facilities and expensive application, while chipped lacquer finishes could be spot repaired on the assembly line. Enamels generally were as durable as lacquers except in certain colors and in the medium and light metallic colors. Metallic colors were created by the use of aluminum in the paint.

Lacquers provided a broader range of colors than enamels. This occurred because greater dispersion of the pigment could be obtained in nitrocellulose. Greater transparency was also achieved, providing unique color effects, especially in the metallic colors which became very popular in the late 1950s. Lacquers did not have the "orange peel" effect found in enamels and gave a smoother appearance than enamels.[21] If a lacquer finish was polished after aging, the gloss returned to a much higher degree than possible in an enamel finish. Lacquers weathered better than enamels and thus were more attractive in the used car market and to the owner who operated his car for many years. The repair of a damaged finish was less expensive for the owner of a lacquer finished car than for the owner of an enamel finished car.

Lucite proved even more durable than Duco, provided a higher gloss than Duco or even the most advanced enamel, and made possible an even wider variety of colors.

Eye appeal is a part of styling which is so important in the sale of a car. General Motors highlighted the superior appearance of Lucite and the ease of upkeep by referring to "Magic Mirror" finish in its advertising. For several years this finish commanded a premium price if ordered by a customer.[22]

It was argued on the trial that if lacquer was superior to enamel the car manufacturers using enamel would have switched to lacquer. However, once a car manufacturer had adopted enamel as a topcoat, it was loathe to convert to lacquer because of the large capital investment needed to make the necessary changes. Conversion would require changes in the physical setup and space requirements of the production line, scrapping of existing machinery and installing new equipment, and the use of

21. Blushing (cloudy appearance on the finished surface), chalking (appearance of pigment on the surface), and flooding (irregular distribution of the pigment within the surface of the film, giving a mottled appearance) were more of a problem with enamels than with lacquers.

22. See n. 24 infra.

different methods in the application of the finish.

The testimony shows that it is difficult to determine the over-all cost of finishing a car in lacquer as opposed to finishing a car in enamel. A gallon of lacquer sold at a higher price than a gallon of enamel —color for color. This differential narrowed during the relevant period because of an increase in the price of enamel. However, the per gallon cost of the topcoat is only one factor in the problem. The material cost of Lucite per car may be reduced because less gallonage is needed than when enamel or Duco is used.[23] The cost of application of enamel may be higher. Repairing an enamel finish on the production line is more difficult and expensive. In 1958 the list price of a Chevrolet ranged from $1,824 to $2,587. The cost of the materials to finish that car in Lucite was $14.80. The saving, if enamel were used, would have been minuscule and not warranted when weighed against the advantages of lacquer's color, styling, durability and lower repair costs.

From all of the evidence, it was General Motors' considered business judgment, well substantiated by the record here, that lacquer was superior to enamel as a topcoat for passenger cars. This business judgment was not affected either directly or indirectly by du Pont's stock ownership in General Motors.

Plaintiffs claim that the volume of General Motors' purchases of finishes from du Pont resulted from the exercise of control by du Pont. General Motors used, in the main, only three sources of supply for finishes. A supplier was qualified if it had a proven record of reliability in meeting delivery schedules and its product was consistent in quality. The qualified suppliers for topcoats and undercoats were du Pont, Rinshed-Mason and Forbes. The qualified suppliers for thinners were du Pont, Grow Solvent and one or two others.

The nature of the product has a great deal to do with lining up additional sources of supply. The most delicate job in the automobile industry is painting the cars and paint is an extremely volatile product. Great reliance must be placed on the research and development that has gone into a particular paint, the uniform quality of the paint, the resources and skill of the supplier, and his ability to deliver large quantities on time.

In line with the decentralized system of operation in General Motors, each car division consisted of four main departments—engineering, purchasing, manufacturing and sales. The engineering and manufacturing departments tested and determined the standards of materials that were to be used. The paint director was a member of the engineering department. The purchasing department procured the materials that were approved after testing.

The first step in the purchase of topcoats was the determination of the range of colors that was to be used for a model year. A particular color could originate within the General Motors organization or could be submitted by a supplier. After the number of colors to be used was determined, the next step was to send them to the engineering department. The latter then requested a qualified supplier to submit a sample for testing or it tested a sample which was proffered by a supplier.

If the sample passed the extensive tests for application, workability, durability etc., the source was approved. Chips painted with the approved topcoat were submitted to other qualified suppliers for

---

23. The solids content of Lucite in a particular color was in most cases higher than the solids content of Duco in the same color. Thus a gallon of Lucite would go further than a gallon of Duco. For example, if Pontiac's purchases of Duco were translated into purchases of Lucite, 90 gallons would do the job call-ing for 100 gallons of Duco, and the resulting total cost of the material to Pontiac would be about the same. Had Chevrolet's 1957 purchases of Duco been purchases of Lucite, the cost per car for the topcoat material would have increased by $1.

matching. If their samples passed the tests, they too were placed on the source sheet. The source sheets were sent to the purchasing department and were called engineering releases.

The cost estimators in the purchasing department requested quotations simultaneously from the qualified suppliers listed in the engineering release. When the requests for quotations were returned with the prices indicated next to the various colors, they were transferred to a worksheet to show how each supplier's price related to the other prices. If necessary, negotiations were conducted to obtain competitive prices. The purchasing department did not know and was not interested in the profit margins obtained by a supplier. It was solely interested in competitive prices, which in the case of topcoats meant differentials of no more than 10 cents per gallon. About two and a quarter gallons of topcoat were needed to finish a car.

The purchasing department then determined the allocation of its requirements to each supplier. The orders given were sufficiently large, so that the supplier could handle them on a competitive basis. Allocations would depend on the proximity of the supplier's location to the particular plant of a car division, the desire to make sure of a match between the paint put on the body by Fisher and that placed on the hood and other parts by the assembling division, the supplier's service available to the division's plant, and the productive capacity of the supplier. Assembly line production requires quick service if problems arise with paints and a continuous flow of supply. Sloan testified that, of the three elements of competition in purchasing materials in the automobile industry, service and quality were more important than price.

Any paint manufacturer who wished to quote on this business could do so. The Cook Company did so, but its price was too high. The Acme Division of the Sherwin-Williams Company, reputedly one of the large paint manufacturers in the country, obtained some topcoat business from General Motors, but was dropped as a source of supply because the quality of its product did not measure up to General Motors' standards. Jones-Dabney submitted samples which had unusual effects, but did not stand up in the testing laboratory. It appears that, of all the paint manufacturers who submitted samples to General Motors, du Pont was the most proficient in doing color work. Du Pont offered innovations in coloring and could produce requested items in a short space of time. They were most successful in passing production tests conducted by General Motors' laboratories.

No evidence was adduced that any competitive source was foreclosed from obtaining finish business from General Motors or that any competitor could have supplied finishes of the same quality and description, and with comparable service, at a price lower than that paid by General Motors to du Pont. There is no evidence that du Pont, directly or indirectly, influenced the decisions made in any of the steps involved in the purchases of finishes.

Plaintiffs have laid great emphasis on the volume of topcoat business given to du Pont, but it must be remembered that their claim relates to finishes, which include undercoats and thinners in addition to topcoats. In 1951 du Pont furnished 81% of General Motors' over-all requirements of finishes. This steadily decreased to 63% in 1959. Fisher Body was the largest buyer of finishes among the General Motors divisions. In 1951 it purchased 68% of its requirements from du Pont and by 1959 this was down to less than 50%. If du Pont had maintained its 1951 position, it would have had additional sales of over $2,500,000 to Fisher in 1955 and over $5,000,000 in 1959.

Du Pont was not the number one supplier to all the divisions. Rinshed-Mason held that position with Oldsmobile for topcoats in 1951–1959 and succeeded to the top position with Cadillac for topcoats in 1955. Fisher purchased undercoats principally from Rinshed-Mason in 1951–1959 and Oldsmobile purchased

undercoats principally from Forbes during the same period. Du Pont was successful in selling thinners to General Motors until the early 1950s, when Grow Solvent began to get some of the business. By 1955 Grow's sales of thinners to Fisher amounted to $1,200,000 and in 1959 they rose to $2,322,000. The reason for the variations between the divisions is that each acted independently of the other for its own best interests.

While finishes and fabrics are separate claims in this action and each must be decided independently of the other, it is impossible to keep the proof compartmentalized. For example, the purchasing department of Fisher, the largest of the divisions of General Motors, procured both finishes and fabrics. Du Pont had relatively little success in selling fabrics to Fisher. See 381 and 382 infra. There is no reason to believe that it had any greater influence over the purchasing department in the purchases of finishes. It is fair to infer that its success in this area was based on furnishing a superior product at competitive prices.

So much for General Motors' practices and procedures in purchasing its finish requirements. Now let us consider du Pont's pricing practices in relation to the products it sold to General Motors. During 1951–1959 du Pont's sales to General Motors of automotive finishes ranged from a low of 89.2% to a high of 96.2% of its production of these items. In topcoats, both Lucite and Duco lacquers and enamel cost about the same to produce. Yet the selling price of lacquer was higher than the selling price of enamel, and the selling price of Lucite was higher than the selling price of Duco. It is plaintiffs' contention that the selling prices of these products should have been about the same, and that because they were not and because such a great percentage of du Pont's production went to General Motors, it must be inferred that du Pont had a captive customer in General Motors.

Cost of manufacture is only one of several components in arriving at price. The main consideration is what price can be obtained in the market place, and this is governed by the value of the product to the purchaser,[24] limited by prices for competitive products of the same quality. The fact is that merchandise of the same quality and description in a product line was sold by du Pont at the same price to all its customers.

The refinishing market furnishes a further example of the propriety of du Pont's pricing policies as regards lacquer finishes. The refinishing market is composed of local shops where the owner takes his automobile to be repaired. Du Pont sold about one third of the requirements of this market, two thirds being sales of enamel and one third being sales of lacquer. The lacquer was sold at about $2 to $2.50 per gallon more than enamel because of consumer demand, even though both cost du Pont about the same to manufacture. The rate of profit on the sale of lacquer to the refinish market was as high as on the sales to General Motors.

The court concludes that du Pont did not, by reason of its stock ownership, control the purchases by General Motors of finishes from du Pont, and it did not insulate General Motors from

---

24. In December 1957 Harlow H. Curtice, president of General Motors, inquired as to the possibility of a reduction in the price of Lucite. C. H. Greenewalt, president of du Pont, replied that substantial economies in material cost per car finished in Lucite had been made and that in certain instances the difference was as low as 25 cents per car over Duco. In addition, he stated that current manufacturing costs on Lucite colors used on the 1958 models were being restudied and that they expected to have some reductions to pass along. The letter also pointed out that Lucite might be cheaper or more expensive than Duco, depending on color and solid content. It concludes with:

"I must say, however, that we have to take a back seat to you when it comes to pricing policy or perhaps the answer is that if you can get people to pay the $183 extra you charge for putting a "Lucite" finish on a Cadillac, it must really be very good indeed."

competition in this line of commerce during the years 1950–1959. Therefore du Pont did not violate § 1 or § 2 of the Sherman Act.

*Fabrics*

Automotive fabrics have been defined by counsel on this trial as coated materials used for trim, upholstery and seat covers in the interior of passenger cars.[25]

Du Pont had extensive experience with nitrocellulose in the manufacture of smokeless powder. Sometime around 1910 it developed an artificial leather called Fabrikoid, which was a cloth backing coated with pyroxylin, a nitrocellulose based solution. Fabrikoid was water resistant and washable. Before du Pont purchased General Motors stock in 1917, it was a principal supplier of this material not only to divisions of General Motors, but to the entire automotive market. Artificial leather was widely used as upholstery in the open touring car which was the usual model made until the mid-1920s. In the succeeding ten years there was a gradual change-over to closed cars.

Fisher Body purchased all of General Motors' requirements of automotive fabrics for closed cars. Immediately after World War II there was a shortage of coated fabrics and Fisher purchased all that du Pont could produce. Thus in 1946 and 1947 du Pont furnished a maximum[26] of 74% and 60%, respectively, of General Motors' requirements of automotive fabrics. At about this time vinyl chloride coatings came into use and by the mid-1950s they had completely replaced pyroxylin coatings. Du Pont's product of this material was called Fabrilite. Other manufacturers produced the same type of material.

Figures are not available for the years 1948–1954, but for the years 1955–1959 du Pont furnished a maximum of 24%, 19%, 21%, 13% and 16%, respectively, of General Motors' requirements.[27] During the years 1955–1959 du Pont sold an average of 86% of its production of automotive fabrics to General Motors. Plaintiffs contend that this fact compels the inference that du Pont controlled General Motors' purchases of fabrics.

86% of sales is impressive, but what that percentage was of du Pont's productive capacity is another matter. The record is barren of any light on this point for the years in question. On the other hand, if the business was as lucrative as plaintiffs try to make it appear from statistical tables, du Pont obviously would have obtained that business, or enlarged its productive capacity to do so, if it controlled General Motors' purchases of fabrics. For example, in 1955 du Pont might have received 90% or $35,701,938 of General Motors' requirements instead of 24% or $9,626,976.

Plaintiffs have placed great reliance on the difference in spread between mill cost and sales price on total sales of fabrics to General Motors compared to total sales to other automobile manufacturers. The individual fabrics varied in color, finish, range of grade and specification of decorative effects by the purchaser.[28]

Prices differed depending on these variations. Plaintiffs have not shown com-

---

**25.** Upholstery refers to the material a person sits on or his back rests against. Fabric for the rest of the interior is referred to as trim.

**26.** Maximum percentages are used because purchases of fabrics from certain major suppliers could not be segregated in General Motors' books.

**27.** The top three suppliers of fabrics each year to General Motors were as follows:

| 1955 | General Tire | 30.7% |
| | Federal Leather | 26.2% |
| | Du Pont | 24.0% |
| 1956 | General Tire | 27.7% |
| | Federal Leather | 28.1% |
| | Du Pont | 19.0% |
| 1957 | General Tire | 25.2% |
| | Federal Leather | 21.8% |
| | Du Pont | 21.0% |
| 1958 | General Tire | 25.8% |
| | Federal Leather | 19.7% |
| | Goodall | 14.2% |
| 1959 | General Tire | 26.4% |
| | Federal Leather | 16.9% |
| | Du Pont | 16.0% |

**28.** Du Pont invented Jeweltone, a fabric with a metallic appearance to go with the

parable purchases of fabrics of like color, finish and grade by other automobile manufacturers, and therefore the difference in spread cannot support a finding sustaining plaintiffs' contention.[29]

At this point reference must be made to du Pont's accounting system and methods of pricing the huge number of products it manufactures. Each product consists of many items of different constructions, colors or styles. It is practically impossible in a large manufacturing operation to allocate specific manufacturing or mill costs (labor, material and plant overhead) to specific items. Consequently a number of items within a product line are gathered together in a category called a cost group, which has a standard unit cost for everything manufactured in that group. A single product such as vinyl upholstery will have a number of cost groups.[30] Cost grouping is an accepted cost accounting procedure. If it were possible to break the figure down by specific items, there would be a great deal of variance in cost between the components of the group due to materials and customer specifications.

When it comes to selling a product, however, the price is not set by adding a markup to the unit price of the cost group. Rather, each order is individually processed and the quotation of price is determined by first arriving at a basic figure called a replacement cost. A number of factors are considered in calculating replacement cost. The replacement cost figure is then increased by evaluating the competitive features of the product in the market, such as quality, product use and price of comparable products. The resulting sales price is quoted to the customer. Although plaintiffs have consistently urged that there was a set markup for profit applied to replacement cost, I do not find this to be true. Profit varies depending on the factors indicated.

It is obvious from the accounting and pricing procedures followed by du Pont that profit on an item cannot be measured by comparing sales price to cost group. This can be accomplished only by measuring sales price against replacement cost. Plaintiffs refused all offers to check the invoices and replacement cost documents available in this area.[31]

The evidence does not justify any finding of the exercise of control by du Pont over General Motors in the purchase of fabrics. On the contrary, du Pont was operating in a highly competitive field and its share of General Motors' requirements belies any such conclusion.

Fisher spent one and a half times as much on fabrics as it did on finishes. For example, in the year 1956 its purchases of fabrics amounted to $36,837,000 while its purchases of finishes amounted to $23,820,000. Du Pont obtained only 19% of Fisher's fabrics business that year, a fact which negatives any claim that du Pont exercised control in this area.

At one time du Pont was able to advance delivery dates for fabrics to Fisher

metallic effect developed in Lucite. Neither Ford nor Chrysler purchased Jeweltone. Nor did they require their fabrics to be embossed in a high temperature dielectric process, as did General Motors. Both of these procedures cost more than the usual coated fabrics, but were designated by General Motors because they were considered to be advantageous from a styling viewpoint.

29. A similar situation exists with regard to the proof on finishes. Undercoats for lacquers were different from those for enamels. In 1956 General Motors started to use a high performance undercoat. The subsequent use of Lucite required an undercoat that was more expensive than the undercoat previously used with Duco. Similarly, thinners for lacquers were different in composition from those for enamels. In addition, a greater quantity of thinner was needed for one gallon of lacquer than for a gallon of enamel.

30. There are some 15,000 items manufactured in the fabrics and finishes department of du Pont and these items are placed in 400 cost groups.

31. On July 28, 1961 plaintiffs were advised by Lewis A. Freeman, who subsequently testified as their accounting expert, that this data must be obtained and analyzed to meet the requirements of essential information on the issues in the lawsuit.

in order to take up the slack caused by failure of other suppliers to deliver on time. At another time du Pont, through its research and development facilities, solved a problem Fisher was having with materials furnished by another supplier. Despite instances of this character, du Pont was unable to increase the percentage which it furnished of Fisher's fabric requirements.

The purchasing procedures for fabrics were the same as those detailed for finishes, supra pp. 378 and 380. There were six or seven qualified suppliers who responded to requests for quotations. A spread sheet was prepared listing the various items for which quotations had been requested, and the bids received were indicated alongside the item. The purchasing agents of Fisher then negotiated competitive prices before making allocations. They exercised unfettered discretion in buying the product best suited for their purposes from the standpoint of price, quality and styling appeal. The purchases were based solely on competitive merit.

■ The court concludes that du Pont did not, by reason of its stock ownership, control the purchases by General Motors of fabrics from du Pont, and it did not insulate General Motors from competition in this line of commerce during the years 1950–1959. Therefore du Pont did not violate § 1 or § 2 of the Sherman Act.

### Fiduciary Claims

Plaintiffs claim that du Pont, by virtue of its ownership of 23% of General Motors stock, owed a fiduciary duty to General Motors which it breached in regard to the sale of automotive fabrics and finishes to General Motors.

While this claim is based in part on the alleged violation of the federal antitrust laws, it does not arise under those laws, but rather is predicated upon an alleged breach of the common law fiduciary duty. I have already found that there has been no violation of the antitrust laws. As to the common law standard, the parties have stipulated that New York courts would find that the applicable state law is that of Delaware, the place of incorporation of General Motors. See Perlman v. Feldmann, 219 F.2d 173, 175 (2d Cir. 1955); Reese & Kaufman, The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit, 58 Colum.L.Rev. 1118, 1125 (1958). The courts have stated that the laws of Delaware and New York are substantially the same in this area of corporate relationships. See Upson v. Otis, 155 F.2d 606, 610–611 (2d Cir. 1946); Mayer v. Adams, 37 Del.Ch. 298, 305, 141 A.2d 458, 462 (1958).

Plaintiffs rely upon what they claim to be a generally accepted principle that dominant or controlling stockholders, like directors, owe a fiduciary duty to the corporation. I have found that du Pont possessed the voting power to control General Motors. See pp. 365 and 367, supra. Beyond percentage of ownership as an indicium of control, however, some legal scholars place greater emphasis on the exercise of control rather than on the power to control. Professor Leech indicates that:

> "The 'control' of a corporation resides in that person or group of persons which in fact determines the corporation's operational and financial policies with minimum practical risk of effective reversal of policy decisions. In that sense, the subordinate corporate official who has broad discretionary authority in the particular area of corporate activity committed to him does not control that part of the corporation, so long as the ambit of his authority is in practice circumscribed by others and his decisions subject to effective review." Leech, Transactions In Corporate Control, 104 U.Pa. L.Rev. 725, n. 1 (1956).

■ The case law supports this analysis and is not as simple as plaintiffs contend. The New York courts have frequently held that a dominant or majority stockholder does not become a fiduciary for other stockholders merely by reason of his voting power. It is only when he steps out of his role as a stockholder and

begins to usurp the functions of director in the management of corporate affairs that such a duty is imposed. Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 123 N.E. 148 (1919); Levy v. American Beverage Corp., 265 App.Div. 208, 38 N.Y.S.2d 517 (1st Dept. 1942); Blaustein v. Pan American Petroleum & Transp. Co., 263 App.Div. 97, 31 N.Y.S.2d 934 (1st Dept. 1941), aff'd, 293 N.Y. 281, 56 N.E.2d 705 (1944); Cleary v. Higley, 154 Misc. 158, 277 N.Y.S. 63 (Sup.Ct.1934), aff'd per curiam, 246 App.Div. 698, 284 N.Y.S. 989 (1st Dept. 1935), application for leave to appeal denied, 270 N.Y. 673, 284 N.Y.S. 989 (1936). These cases have been cited with approval in Delaware. Blish v. Thompson Automatic Arms Corp., 30 Del.Ch. 538, 587, 64 A.2d 581, 606 (1948); Allied Chemical & Dye Corp. v. Steel & Tube Co. of America, 14 Del.Ch. 1, 13, 120 A. 486, 491 (1923).

The cases relied upon by plaintiffs do not depart from the requirement that more than mere power to control is necessary to incur a fiduciary duty. In Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919), the controlling stockholder was active in the affairs of the corporation. The Court, in holding that the doctrine under which majority stockholders exercising control are deemed trustees for the minority was applicable in that case, said:

> "But the doctrine by which the holders of a majority of the stock of a corporation *who dominate its affairs* are held to act as trustees for the minority does not rest upon such technical distinctions. It is *the fact of control* of the common property *held and exercised,* not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation." 250 U.S. at 492, 39 S.Ct. at 537 (emphasis added).[32]

In Pepper v. Litton, 308 U.S. 295, 297, 60 S.Ct. 238, 240, 84 L.Ed. 281 (1939), the Court was dealing with a " 'one-man' or family corporation * * * of which respondent was the dominant and controlling stockholder." The Court found respondent to be a fiduciary, citing *Bogert*. It appears that the words "dominant and controlling" in *Pepper* were intended to mean actual domination through the exercise of control.

In Chelrob, Inc. v. Barrett, 293 N.Y. 442, 57 N.E.2d 825 (1944), the court recognized the doctrine that, to be considered fiduciaries, majority shareholders must usurp the functions of directors and actually use their power to dominate and control. Active influence and control was inferred in that case, since the corporate majority shareholder and the corporation whose shares it held "were operated as part of a 'system' " and "the directors acted upon the advice of experts retained by the system". 293 N.Y. at 460, 57 N.E. 2d at 834.

 It seems clear, therefore, that the mere fact of du Pont's ownership of 23% of General Motors stock and the election of several of its nominees as directors is not enough to impose a fiduciary duty upon du Pont. Nevertheless, there is some evidence which would permit an inference that even after 1923 du Pont did exert some degree of influence and control over the general business affairs of General Motors, through the membership of its designees on the Executive Committee and Policy Committee. See pp. 365, 367 supra. Whether on this record that influence was enough to impose the fiduciary duty need not be decided, since it is my conclusion that, even if there was a fiduciary duty, it was not breached in relation to the purchases of finishes and fabrics.

 When a fiduciary is challenged for having engaged in self-dealing

---

32. In Ripley v. International Rys. of Cent. Amer., 8 A.D.2d 310, 316, 188 N.Y.S.2d 62, 71 (1st Dept.1959), aff'd, 8 N.Y.2d 430, 209 N.Y.S.2d 289, 171 N.E.2d 443, (1960), the court cited this passage in *Bogert* to support its conclusion that apart from a 42% stock ownership "control was, as a practical matter, completely effectual," and that therefore a fiduciary duty existed.

in property or services of the corporation, the fiduciary obligation results in both the burden of coming forward with evidence and the burden of persuasion being shifted to the fiduciary to demonstrate that the transactions were scrupulously fair.[33] The test is an objective one; liability of the controlling corporation hinges on the fairness of the challenged transactions.[34]

██ To determine fairness, courts consider the market price of the goods sold if one is ascertainable,[35] whether the corporation received full value in all the commodities purchased,[36] the extent of dominance by the controlling corporation,[37] who initiated the complained of transactions,[38] and more generally whether reasonable and disinterested directors would have assented to the transactions.[39]

The business relationships growing out of the sale of automotive fabrics and finishes by du Pont to General Motors were completely unrelated to the stock interest that du Pont held in General Motors. These sales and purchases resulted from arm's length transactions under competitive conditions. The prices paid by General Motors were market place prices. The quality of the products and the service that was furnished with the products were equal to if not better than what was available in the market place.

██ I find that, even if du Pont was a fiduciary, it has carried its burden and it has not violated any fiduciary duty.

### Conclusion

I have found that the defendants have neither violated §§ 1 and 2 of the Sherman Act nor breached a fiduciary duty. I also find that the plaintiffs have failed to prove the other essential element of their charge, that General Motors was injured by du Pont. There is no evidence in this voluminous record that General Motors could have purchased either finishes or fabrics on terms and conditions, including price, quality and service, more favorable than those received from du Pont. Even if plaintiffs had established substantive violations, they could have recovered nothing in the way of damages flowing from a private injury.

The above opinion shall constitute the findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

The first and ninth causes of action in the amended consolidated complaint are dismissed. So ordered.

33. Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 598, 41 S.Ct. 209, 65 L.Ed. 425 (1921); Cheff v. Mathes, 41 Del. Ch. 494, 504, 199 A.2d 548, 554 (1964); Kennedy v. Emerald Coal & Coke Co., 28 Del.Ch. 405, 415, 42 A.2d 398, 402 (1944); Shlensky v. South Parkway Building Corp., 19 Ill.2d 268, 280, 166 N.E.2d 793, 800 (1960); 1 Hornstein, Corporation Law & Practice § 439, at 554 (1959); 3 Fletcher, Cyclopedia Corporations § 974 (perm. ed. rev. vol. 1965); Annot., 33 A.L.R.2d 1060, 1072-73 (1954). Cf. Guth v. Loft, Inc., 23 Del.Ch. 255, 275, 5 A.2d 503, 512 (1939). See Note, The Fairness Test of Corporate Contracts With Interested Directors, 61 Harv.L.Rev. 335, 336 & n. 11 (1948).

34. See Pepper v. Litton, 308 U.S. 295, 306-307, 60 S.Ct. 238, 84 L.Ed.2d 281 (1939) ("whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain"); Austrian v. Williams, 103 F.Supp. 64, 75 (S.D.N.Y.1952); Ripley v. International

Rys. of Cent. Amer., 8 A.D.2d 310, 318, 188 N.Y.S.2d 62, 73 (1st Dept.1959), aff'd, 8 N.Y.2d 430, 209 N.Y.S.2d 289, 171 N.E.2d 443 (1960); Wadmond, Conflicts of Business Interests, 17 Bus.Lawyer 48 (1961); Farmer, Fiduciary Duty of Directors and Officers of Private Corporations, 27 Tenn.L.Rev. 284 (1960).

35. See, e.g., Williams v. Salisbury Ice Co., 176 Md. 13, 3 A.2d 507 (1939); Moriarty v. James Butler Grocery Co., 261 App. Div. 20, 24 N.Y.S.2d 105 (1st Dept.1940).

36. See Shlensky v. South Parkway Building Corp., 19 Ill.2d 268, 283, 166 N.E.2d 793, 801 (1960).

37. See Austrian v. Williams, 103 F.Supp. 64, 75 (S.D.N.Y.1952).

38. See Everett v. Phillips, 288 N.Y. 227, 43 N.E.2d 18 (1942).

39. See International Radio Tel. Co. v. Atlantic Communication Co., 290 F. 698, 702 (2d Cir. 1923); see also Chelrob, Inc. v. Barrett, 293 N.Y. 442, 57 N.E.2d 825 (1944).